Robert DANIELS, Plaintiff–Appellee,

v.

ESSEX GROUP, INCORPORATED, Defendant–Appellant.

No. 90–2663.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1991.

Decided July 24, 1991.

Steven L. Jackson, Baker & Daniels, Fort Wayne, Ind., for plaintiff-appellee.

Herbert C. Snyder, Jr., Richard P. Steele, Barnes & Thornburg, Fort Wayne, Ind., for defendant-appellant.

Before CUMMINGS, FLAUM and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

In 1978, Robert Daniels, a thirty-seven-year-old black man, began working in the Wire and Cable Division of the Essex Group, Inc., located in Columbia City, Indiana. Ten years later, in April 1988, Daniels resigned. He subsequently brought suit against his former employer under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*). Daniels' complaint enumerated multiple instances of racial harassment at Essex and also alleged the existence of a hostile work environment. The harassment of which Daniels complained extended over the course of his tenure at Essex but intensified in the months immediately preceding his resignation. Moreover, the specific acts cited by Daniels were of both a generalized and particularized nature. Some of the slurs were directed at him by name. Others were general racist symbols, but because Daniels was the only black working in the particular division of Essex in which the harassment took place, he saw himself as the target of all of the incidents. Daniels' case came before Judge Lee of the Northern District of Indiana. Plaintiff received a bench trial on November 13, 1989. The court issued its findings of fact and conclu-

sions of law on June 27, 1990, 740 F.Supp 553, finding against Essex and agreeing with Daniels that he had been unduly harassed on account of his race. In accordance with Title VII, Judge Lee awarded back pay of $38,548.84, prejudgment interest of $3,782.76, and front pay and attorneys' fees in the amount of $35,455.20. For the following reasons, we affirm.

## I.  FACTS

Even before the first of the three most serious incidents occurred, Daniels' work environment was not discrimination-free. In his ten years at Essex, Daniels' colleagues told "nigger jokes," nicknamed the plaintiff "Buckwheat" and teased him because he conversed with white women at work. During this time, Daniels did not stand idly by and soak up the epithets without protest. On the contrary, he complained to his co-workers, to his supervisor, and to the Personnel Director at Essex, none of whom did anything to nip the discriminatory treatment in the bud. Notwithstanding his complaints, Daniels endured the frequent harassment, choosing to remain in his job throughout the ten-year period. As he testified at trial, "deep down inside they [bothered me]. It wouldn't be enough to make me want to quit working with the guys" (Tr. 53–54). During this time, Daniels consistently earned high marks for his on-the-job performance.

The harassment escalated and intensified beginning in the fall of 1987 when events began to occur that were of a more menacing character than the ribbing Daniels endured. One morning Daniels clocked in at his usual arrival time of 7:00 a.m. and made the following discovery en route from the time clock to his work station. Hanging from a doorway was a human-sized dummy with a black head. The dummy wore white overalls and had what appeared to be simulated blood dripping on it. Daniels reported the existence of the dummy to his immediate supervisor, Mike Rohrer. Rohrer

claimed to know nothing of the dummy and reassured Daniels: "Well, Bob, don't get excited. I will take care of it. Don't worry about it" (Tr. 57).

When Daniels left his work station at the end of his eight-hour shift, the dummy was still hanging. Twelve hours later, at 3:00 a.m. the next day, Daniels reported to work early in response to a supervisor's request. Upon arrival, plaintiff discovered that the dummy was still hanging from the same spot.

The second of the three most grave incidents involved graffiti written on the bathroom walls of Daniels' department. Daniels found the initials "KKK" and the slogan "All niggers must die" scrawled onto the bathroom walls. From Daniels' testimony and from the supervisor's admission that he could not recall all of the slogans written on the bathroom walls over the years, the court concluded that someone wrote racial slurs onto the bathroom walls on several occasions. Describing the effect that the graffiti had upon him, Daniels said, "[i]t put a little fear into me" (Tr. 60). As with the dummy, Daniels reported these slogans to his supervisor, who again said to the plaintiff: "Oh, Bob, don't get excited. I will take care of it" (Tr. 61). The slogans were painted over, but according to the plaintiff, they reappeared three or four times (Tr. 61). The district court found that no reasonable effort was made "to discourage further incidents despite the repetitive nature of their occurrences." 740 F.Supp. at 556.

While the graffiti on the bathroom wall did not specifically mention Daniels by name, the writing on the scale-house wall did.[1] It appeared sometime before the dummy. The exact words were "hi Bob KKK." As with the other racial incidents, Daniels reported the graffiti to Rohrer, who said, "Bob, don't worry about it. You are getting excited about nothing. Don't worry about it. I will take care of it" (Tr. 66). According to Daniels, the writing was

---

**1.** The district court said, "the scale house is a small shed-type building located outdoors where tools and other such items are kept."  740

F.Supp. at 556 n. 4. On occasion, Daniels went to the scale house as part of his job.  *Id.*

still on the scale-house wall when he resigned in April 1988 (Tr. 85).

Daniels reported two other events during the same time that he began to feel threatened and harassed by the dummy, the bathroom graffiti, and the writing on the scale-house wall. The first of these events took place at work when a co-worker by the name of Art Reimer ("Art") approached Daniels and called him a "nigger" and threatened to "whip" Daniels, "take [him] out on [route] 30" and "beat" him (Tr. 64). Art also threatened to injure the plaintiff's four-year-old son. This incident was reported to Essex supervisors, who brought Art and Daniels together in an attempt to resolve their differences. Daniels testified in court that Art continued to call him racist names such as "dumb nigger" after the meeting occurred (Tr. 118).

The final incident testified to by Daniels occurred off the premises of Essex three to four weeks before Daniels quit his job. At about 2:30 one morning, Daniels heard a loud noise on the porch of his home. When he investigated the noise later in the day, he found that someone had shot a bullet into the wall near his bedroom window (Tr. 65). Although Daniels had no proof that an Essex employee had fired the shot into his house, he claimed that the incident precipitated his resignation. On appeal, counsel for defendant argued that because Daniels had failed to prove that an Essex employee had actually fired the shot, the district court improperly considered the evidence as probative of racial harassment. However, the district court discussed the incident, not as part of its legal analysis of racial harassment at work, but in its summary of Daniels' testimony. As we will show below, the incident has bearing in its effect on plaintiff's own fear and feeling of persecution.

All of the incidents took their toll on Daniels. He testified that the events described above made him nervous and that

"I just couldn't work there and look around my shoulder all the time and what not. I didn't want to be out there no more. It was a threat to me. It was a threat to * * * my family. I didn't want to go through that stress and strain" (Tr. 71).

Daniels met with Vickie Churchward, who worked in the Personnel Department at Essex, two to three weeks before he quit. He proclaimed his intent to resign because he was "tired of the employees [sic] harassment and racial jokes" (Tr. 68). Churchward suggested a transfer to another department.[2] When he submitted his formal resignation, Daniels wrote that he couldn't take it anymore: "I just got tired of the harassment and the writings on the walls and threats to me and it just kept me nervous all the time" (Tr. 70).

Daniels left Essex in April 1988. The district court found that at no time before his departure did a meeting of the Essex workforce take place to condemn the racial harassment. Nor did the management of Essex ever issue a warning announcing the employer's abhorrence of racial harassment. 740 F.Supp. at 556. Churchward testified that Essex and the employees' union issued a joint resolution condemning discrimination in the workplace to all employees. *Id.* at 556–557. However, the district judge noted that Daniels never received the memo, and that it was not signed by the union until March 31, 1988, a few weeks before Daniels resigned and well after the specific events complained of by Daniels. *Id.* at 557 n. 7. As for the resolution's content, the district judge found it to be "a completely ineffective response to racially discriminatory incidents by the very nature of [the resolution's] generic message and distribution." *Id.*

In addition to the evidence introduced by Daniels concerning the racial harassment directed at him, he also introduced evidence of general racial prejudice. *Id.* at 558.

**2.** This suggestion by Churchward prompted the district court to reject her testimony that Daniels never mentioned racial harassment in their meeting. Rather, Churchward contends that Daniels proclaimed only that he was tired of working at Essex. If this were true, "it is inconceivable that Churchward would recommend a transfer to another department * * * if he had not mentioned the specific racial problems * * *. If he was merely tired of working at Essex, a transfer would not have made a difference * * *." 740 F.Supp. at 557 n. 9.

The first of these instances concerned James Alexander, a black employee of Essex. Alexander worked at the Fort Wayne division of Essex and sought a transfer to the Columbia City plant, where Daniels worked. At his interview, Alexander was told that the Columbia City plant, along with all of the other Essex plants in the country, was "extremely prejudiced" (Tr. 20). Alexander responded that he could withstand prejudice so long as he received the backing of management. The interviewer, who was one of Alexander's supervisors at the Fort Wayne plant, neither confirmed nor denied that the backing of management would be forthcoming in Columbia City. Ultimately, Essex gave the position sought by Alexander to a white man, but Alexander never received notification that the Columbia City position was filled. *Daniels*, 740 F.Supp. at 558.

The other incident credited by the district judge as evidence of the racial animosity at Essex involved more graffiti. In addition to the references to Bob and the KKK on the scale-house wall, someone also scrawled the name "Reinaldo Gonzalez." On direct examination, supervisor Rohrer testified that Reinaldo Gonzalez was the nickname for Randy Heron, an Essex employee who "looked kind of like a Mexican" (Tr. 144–145); *Daniels*, 740 F.Supp. at 558.

In March 1989 plaintiff filed his first amended complaint under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*).

## II. ANALYSIS

### A. *The Trial Court's Credibility Determinations*

Defendant Essex Group challenges the district court's findings of fact, claiming that they are clearly erroneous. We need not reweigh each of the picayune discrepancies raised by the defendant in its brief and at oral argument. Although the defendant acknowledges the appropriate standard of review, accepting its position would require us to retry the case in order to test the credibility of the various witnesses who testified. But this Court's role in reviewing findings of fact, especially when such findings turn on determinations of credibility, is much more limited than that. Our inquiry is governed by the plain language of Rule 52(a) of the Federal Rules of Civil Procedure, which provides that:

> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Rule 52(a) thus demands deference by a reviewing court as to a trial court's findings of fact. We may conclude that a finding of fact is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). In conducting this inquiry, we must not retry the case or decide factual issues *de novo*. *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511. Moreover, when "there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. at 1511; *Amadeo v. Zant*, 486 U.S. 214, 226, 108 S.Ct. 1771, 1778, 100 L.Ed.2d 249 (1988).

This Court has time and again recognized the discretion that a trial judge has in "weighing the evidence, and choosing from among conflicting factual inferences * * * and he has the inherent right to disregard the testimony of any witness when he is satisfied that the witness is not telling the truth * * *." *Gianukos v. Loeb Rhoades & Co.*, 822 F.2d 648, 652–653 (1987), quoting *Sun Life Assurance Co. v. Stacks*, 187 F.2d 17, 20 (7th Cir.1951); see, *e.g., Landau & Cleary, Ltd. v. Hribar Trucking, Inc.*, 807 F.2d 91, 93 (7th Cir.1986); *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 314 (7th Cir.1986); *Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150, 156–157 (7th Cir.1985); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 (7th Cir.1985) ("The district judge is

manager of the entire swirl of facts, [and] because appellate courts never are in a better position than the district court, and often are in a worse one, a substitution of judgment would increase the randomness of the process without increasing accuracy * * *."), certiorari denied, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986); *United States* ex rel. *Jones v. De Robertis*, 766 F.2d 270, 273 (7th Cir.1985) ("A judge may disbelieve testimony, and he may do this even without giving reasons."), certiorari denied, 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986).

At trial, both sides primarily relied upon the testimony of witnesses to make and rebut evidence. Therefore, the district judge had to make credibility determinations based upon the demeanor and tone of voice of each witness. Because these factors "bear so heavily on the listener's understanding of and belief in what is said," *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512, the district judge had appropriate and wide latitude to credit the plaintiff's version of the case and to reject the defendant's conflicting testimony. At the trial Essex produced two witnesses, namely, Personnel Manager Vickie Churchward and plaintiff's supervisor, Mike Rohrer. In its opinion the district court disbelieved them and instead credited the testimony of Robert Daniels and his brother Thomas, who photographed the scale-house wall graffiti ("hi Bob KKK") to document the racial harassment. *E.g., Daniels*, 740 F.Supp. at 555 n. 1 ("this court believes the plaintiff's version of the facts" concerning the dummy); *id.* at n. 2 ("[t]his court, therefore, believes that there were several incidents of racial slurs written on the bathroom walls as Daniels testified"); *id.* at n. 5 ("this court finds Daniels' version of the facts to be more credible than the defendant's" as to whether Rohrer knew about the graffiti on the scale-house wall). All critical findings of fact are clearly supported by the record, and the court's determination that the Daniels brothers were more credible than defendant's witnesses took into account all the components of credibility. *Id.* at n. 5 ("Based on the demeanor of the witnesses as they testified

and their attention to detail, this court finds that the plaintiff and his brother testified credibly regarding the scale-house incident and the facts surrounding the picture taking."). In addition to relying on the testimony of the Daniels brothers, the district judge also highlighted the testimony of James Alexander, who, as noted above, had been denied a position at the Columbia City plant. *Id.* at 558.

### B. *Racial Harassment Due to Hostile Work Environment as a Matter of Law*

While our review of the trial court's credibility determinations is deferential under the clearly erroneous standard of review, the defendant characterizes the district court's finding as to the existence of a hostile work environment as a question of law subject to *de novo* review (Br. 30). As support, Essex cites *Brooms v. Regal Tube Co.*, 881 F.2d 412 (7th Cir.1989), in which the Court said that "[t]he existence of a hostile work environment is clearly a question of law." *Id.* at 420. In *Brooms*, however, the parties apparently stipulated to the appropriate standard of review, for in making this statement, the Court cites no authority and makes the assertion as though it is uncontroverted.

Although it is beyond dispute that pure questions of law should be reviewed *de novo*, the existence of racial harassment in a hostile work environment involves an application of law (the standards governing the existence of racial harassment and hostile work environment discrimination) to facts (the specific discriminatory conditions alleged by the plaintiff). If the trial judge correctly states the law, then his findings as to whether the facts meet the legal standard will be disturbed only if they are clearly erroneous. *Pullman–Standard v. Swint*, 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986). Our review would be more searching if the district court has committed an error of law, including one that "infect[s] a so-called mixed finding of law and fact, or a

finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp. v. Consumers Union,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984); *Jennings v. Tinley Park Community Consol. School Dist. No. 146,* 864 F.2d 1368, 1373 (7th Cir.1988) (stating that "respect and deference are owed to the district court's purely factual determinations, but less so to those determinations that depend upon or incorporate a rule of law").

Here the district judge properly understood and expressed the current legal standards for finding racial harassment in a hostile work environment. Because he did not misstate, misinterpret or misapply the law, we apply the clear error rule to his findings, for the defendant takes issue with the trial judge's view of the evidence, not with his view of the law. *Starks v. George Court Co., Inc.,* 937 F.2d 311, 316 (7th Cir.1991); *Swanson v. Elmhurst Chrysler Plymouth, Inc.,* 882 F.2d 1235, 1238 (7th Cir.1989), certiorari denied, —— U.S. ——, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990); *EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 309 (7th Cir.1988).

It is uncontroverted that Title VII covers claims of discrimination due to the existence of a hostile environment. The Fifth Circuit was apparently the first court to read Title VII to cover such claims. In *Rogers v. EEOC,* 454 F.2d 234 (1971), certiorari denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), the court recognized that "today employment discrimination is a far more complex and pervasive phenomenon, as the nuances and subtleties of discrimination are no longer confined to bread and butter issues." *Id.* at 238. Recognizing the liberal interpretation to be accorded Title VII in order that "the inconvenience, unfairness, and humiliation of ethnic discrimination" will be eliminated, the court found that Title VII "sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." *Id.*

The Supreme Court recognized that hostile environment harassment claims are cognizable under Title VII for discrimination on the basis of race, ethnicity, and gender. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–2405, 91 L.Ed.2d 49 (1986). The Court approvingly cited *Rogers* for the proposition that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.* at 65, 106 S.Ct. at 2405. While *Meritor* specifically recognized a cause of action for sexual harassment, the Court implicitly approved claims for racial harassment. *Id.* at 65–66, 106 S.Ct. at 2404–2405. More recently, in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Court reiterated its view that racial harassment in employment is actionable under Title VII. In holding that Section 1981 (42 U.S.C. § 1981), does not provide a cause of action for racial harassment, the Court went on to say that "such conduct is actionable under the more expansive reach of Title VII of the Civil Rights Act of 1964." *Id.* at 180, 109 S.Ct. at 2374.

This Court has on repeated occasions recognized that racial harassment provides a basis for an independent claim under Title VII. *E.g., Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1308 (1989); *Nazaire v. Trans World Airlines, Inc.,* 807 F.2d 1372, 1380 (1986), certiorari denied, 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987); *Hunter v. Allis–Chalmers Corp., Engine Div.,* 797 F.2d 1417, 1420 (1986). In *Nazaire,* we discussed the standard of liability for racial harassment claims: "The question in each case is whether the quantity and frequency of the [racial and ethnic slurs] are sufficient to state a violation of Title VII * * *. This determination must be made on a case-by-case basis after considering the totality of the circumstances." *Nazaire,* 807 F.2d at 1380–1381. While a pervasive pattern of racial jokes will give rise to liability, a "single, isolated racial joke, unattended by *any* indicia of discriminatory animus, may not be sufficient in itself to establish a violation." *Id.* at 1381, quoting *Carter v. Duncan–Huggins, Ltd.,* 727 F.2d 1225, 1236 (D.C.Cir.1984) (emphasis in original).

Because the legal inquiry into racial harassment claims vests discretion in the

trier of fact to make particularized determinations in individual cases, the district judge articulated a systematic, multi-factor approach to harassment claims arising under Title VII. He identified six steps to be taken by a court analyzing racial harassment claims under Title VII:

(1) The employee belongs to a protected group;

(2) The employee was subject to unwelcome harassment;

(3) The harassment complained of was based on race;

(4) The harassment complained of affected a term, condition or privilege of employment;

(5) Plaintiff must be able to prove that the employer knew or should have known of the harassment and failed to take prompt remedial action; and

(6) The employee acted reasonably under the circumstances.

*Daniels*, 740 F.Supp. at 560–561.

Other courts reviewing harassment claims have articulated the proper inquiry differently, separating out the factors in alternative ways. In *Andrews v. City of Philadelphia*, 895 F.2d 1469 (1990), a sex discrimination case, the Third Circuit first recognized the broad principle that "harassment because of an intimidating and offensive work environment [must be established] 'by the totality of the circumstances, the existence of a hostile or abusive working *environment* which is severe enough to affect the psychological stability of a minority employee.'" *Id.* at 1482, quoting *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir.1989) (emphasis in original). The court proceeded to identify five (rather than six) "constituent" parts of a successful claim for establishing harassment in a hostile work environment under Title VII:

(1) the employees suffered intentional discrimination due to sex;

(2) the discrimination was pervasive and regular;

(3) the discrimination detrimentally affected the plaintiff;

(4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and

(5) the existence of respondeat superior liability.

*Andrews*, 895 F.2d at 1482. *Cf. Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619–620 (6th Cir.1986) (same), certiorari denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

The *Andrews* court explained its five-part test by noting the importance of evaluating a sexual harassment claim against both an objective and subjective standard. Under the subjective standard (part (3) of the *Andrews* test), the female plaintiffs must show that they had been personally injured by the harassment. *Andrews*, 895 F.2d at 1483; *Rabidue*, 805 F.2d at 620. However, the objective standard places a check on claims for relief by the supersensitive "eggshell" plaintiff, requiring the fact-finder to determine whether the work environment is actually so hostile that it "would have interfered with a reasonable individual's work performance and would have affected seriously the psychological well-being of a reasonable employee." *Rabidue*, 805 F.2d at 620.

■ This Court, rather than adopting a multi-factor test that has the potential for a mechanical application that overlooks or underemphasizes the most important features of the harassment inquiry, has evaluated Title VII harassment claims against both the objective and subjective standard. *Brooms v. Regal Tube Co.*, 881 F.2d 412 (1989), a case finding liability for sexual harassment due to the existence of a hostile work environment, expressly approved the application of objective and subjective standards as discussed in *Rabidue*. *Brooms*, 881 F.2d at 418. The Court drew upon the Sixth Circuit's decision and earlier intimations in *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 213 (1986), and set forth this articulation of the proper legal inquiry:

[A] district court must employ a dual standard when evaluating a Title VII sexual [or racial] harassment claim, considering the likely effect of a defendant's conduct upon a reasonable person's abili-

ty to perform his or her work and upon his or her well-being, as well as the actual effect upon the particular plaintiff bringing the claim.

*Brooms*, 881 F.2d at 419. Expressing the Title VII hostile work environment inquiry in terms of the objective and subjective standards allows the fact-finder to keep an eye on the ball more easily than either the five- or six-factor tests put forward by various other courts.

The subjective standard permits a court to give proper weight to the employee's injury in fact, acknowledging the different ways in which a plaintiff initially responds to or copes with harassment. The employee may quit "cold turkey" or, as in Daniels' case, may experience a prolonged period of turmoil in which the individual regularly avoids the workplace for fear of suffering further harassment. Alternatively, an employee may react angrily to the racial hostility, and may more easily be provoked into arguments or physical altercations with those co-workers responsible for the harassment.

Were the victim's subjective perception of injury the only basis for evaluating a Title VII harassment claim, a court would have no basis for reviewing the reasonableness of each individual claim. Therefore, the objective standard allows the fact-finder to consider the work environment and the instances of harassment against a reasonableness standard. Application of the objective standard permits the evolution of a judicial consensus as to the constitutive elements of cognizable harassment in a hostile work environment.

Once the court reaches the conclusion that, based upon both the subjective and objective standards, the employee has stated a valid harassment claim, it must conduct one additional inquiry before holding the employer liable for acts of harassment by individual employees. *Brooms* reiterated this Court's position that "an employer is liable for an employee's action if the employer knew or should have known about an employee's acts of harassment and fails to take appropriate remedial action." 881 F.2d at 420; see also *Volk v.*

*Coler,* 845 F.2d 1422, 1436 (7th Cir.1988). We have emphasized the same requirement in cases involving racial harassment claims. *Hunter v. Allis–Chalmers,* 797 F.2d at 1422 ("[A]n employer who has reason to know that one of his employees is being harassed in the workplace by others on grounds of race, sex, religion, or national origin, and does nothing about it, is blameworthy.").

1. Application of the subjective standard

■ The effects of the changed work environment upon Daniels are undeniable. As the only black employee in his department, he took each individual act of racial harassment personally. In the fall of 1987, when he first spotted the dummy suspended in the doorway, he believed that it was meant to signify violence towards the black employees at Essex and himself (Tr. 56). Although his testimony would be credited as to the effect of the dummy upon him had he kept his feelings to himself, the effigy upset him enough for him to complain to his supervisor.

The next incident of racial harassment reported by Daniels involved the graffiti, "KKK" and "All niggers must die," written on the restroom wall in his department. The slogans had an effect on Daniels similar to that of the dummy. He took the initials "KKK" to stand for the Ku Klux Klan and acts of violence, white sheets and hatred of blacks for which the organization is infamous. As for the proclamation that "All niggers must die," Daniels said that this graffiti made him afraid (Tr. 60). Again, as with the dummy, Daniels reported the graffiti to his supervisor.

Adding to the hostile work environment which Daniels perceived was the racist slur and threat he received from Art Reimer, a fellow Essex employee. When Art called the plaintiff "nigger" and threatened to beat him up, and threatened his family, Daniels became fearful as a result of the harassment. Therefore, when someone fired a gunshot into his home one night, Daniels surmised that someone at work was responsible. According to his testimo-

ny, this was the last straw. Daniels resigned, and stated in writing that he couldn't take working at Essex any longer (Tr. 70). Even though the physical threat by Art was not specifically racial in nature, it may be considered as a predicate act in establishing racial harassment in a hostile work environment, because it would not have occurred but for the fact that Daniels was black. *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014 (8th Cir.1988); *McKinney v. Dole*, 765 F.2d 1129, 1138–1139 (D.C.Cir. 1985).

By the time that Daniels quit, the racial harassment profoundly affected him both physically and psychologically. He changed from being the diligent, good worker that he had been into an argumentative employee with whom it was hard to get along. Moreover, his absenteeism increased in the months after the dummy incident. He also lost 30 to 40 pounds. Defendant irresponsibly suggests on appeal, without the slightest measure of support in the record, that Daniels' physical and emotional problems could be attributed to other factors such as substance abuse or economic hard times (Br. 34). Not only is this suggestion completely unfounded in fact, it also could be construed as a not-so-subtle attempt to link drugs and money problems with the plaintiff simply because he is black.

It is well established that the victims of racial discrimination suffer physically and emotionally as a consequence of multiple incidents of harassment in a hostile work environment. In *Rogers*, the Fifth Circuit recognized that "[o]ne can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." *Rogers*, 454 F.2d at 238; see also *Walker v. Ford Mo-*

*tor Co.*, 684 F.2d 1355, 1359 (11th Cir.1982) (despite plaintiff's objections, use of " 'repeated' [racially abusive language] * * * made [plaintiff] feel unwanted and uncomfortable in his surroundings"); *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924 (5th Cir.1982) (quoting *Rogers* ); *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982) ("Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined with regard to the totality of the circumstances.").[3]

Daniels has met his burden under the subjective standard. The record is replete with evidence that he was profoundly upset and affected by the racial harassment that he withstood at Essex. Each incident of racial harassment compounded his fear and diminished his ability to endure the taunts of his co-workers in the hostile work environment.

2.   Application of the objective standard

Having determined that Daniels suffered palpable physical and psychological injuries from the racial harassment, we turn to an inspection of the evidence in light of the objective standard. The work environment and the injuries suffered by Daniels are to be measured against a reasonableness standard.

■   On appeal, defendant claims "there is *no* reported decision in which so few and impersonal instances of harassment have been found sufficient to establish a hostile work environment." (Br. 33) (emphasis in original). Essex mischaracterizes the proper inquiry that a court must make. The number of instances of harassment is but one factor to be considered in the examination of the totality of the circumstances. A

---

**3.** The psychic injury of racial harassment has been addressed in some detail by legal scholars in the context of the debate over regulation of racist speech: "Psychologists and sociologists have done much to document the effects of racist messages on both victims and dominant-group members. * * * From the victim's perspective racist hate messages cause real damage." Mari J. Matsuda, *Public Response To Racist Speech: Considering the Victim's Story*, 87

Mich.L.Rev. 2320, 2340 (1989). The physiological symptoms of racial harassment include difficulty in breathing, rapid pulse rate, post-traumatic stress disorder, hypertension, alcoholism and suicide. *Id.* at 2336 & n. 84. Alternatively, the psychological effects can also be devastating for the victims. These include headaches, social withdrawal, chronic depression, anxiety neurosis, and displaced aggression. *Id.*

Title VII plaintiff does not prove racial harassment or the existence of a hostile working environment by alleging some "magic" threshold number of incidents. Conversely, an employer may not rebut a claim simply by saying that the number of incidents alleged is too few. Because a court must make a particularized inquiry into an employment environment that gives rise to racial harassment, it will consider a range of factors to determine whether the objective standard has been met. In *Brooms*, we cited approvingly the factors enumerated by the Sixth Circuit in *Rabidue*. In reviewing the reasonableness of a harassment or hostile work environment claim, a court may consider:

> the nature of the alleged harassment, the background and experience of the plaintiff, her coworkers, and supervisors, the totality of the physical environment of the plaintiff's work area, the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs, coupled with the reasonable expectation of the plaintiff upon voluntarily entering that environment.

*Brooms*, 881 F.2d at 419, citing *Rabidue*, 805 F.2d at 620. Like the Sixth Circuit, we noted that these factors correspond with Equal Employment Opportunity Commission guidelines (29 C.F.R. § 1604.11(b)) stressing the individualized nature of a probative inquiry. *Id.*

We agree with the district court that the racial incidents described by Daniels were immediately threatening to him and that "they would have adversely affected the work performance and well-being of a reasonable person." *Daniels*, 740 F.Supp. at 560. Unlike other cases where a relatively small number of racial incidents has been found to be inadequate to give rise to Title VII liability, *e.g.*, *Nazaire*, 807 F.2d at 1380, here each of the incidents was directed personally at Daniels over the course of

a few months. The district court found that the black dummy hung in the doorway near plaintiff's workstation was directed at Daniels. Even though the restroom graffiti ("KKK" and "All niggers must die"), unlike the scale-house wall graffiti ("hi Bob KKK") did not name the plaintiff personally, he was the only black working in the department where the restroom was located. Moreover, even when Daniels' supervisor painted over the graffiti, it reappeared on several occasions. The district court described in vivid terms the effect that the mention of the Ku Klux Klan would have on blacks:

> The most violent threats to black society are well known to come from that organization. Furthermore, there is no more chilling image than that of a black man being hung by the KKK. Any reasonable person who is targeted by such a terrorist organization over a period of time without any protection from his employer would surely suffer similar adverse effects as those experienced by Daniels.

*Daniels*, 740 F.Supp. at 560. Plainly, any black would find this graffiti threatening.[4]

In addition to the instances of racial harassment directed at Daniels by his co-workers, a reasonable employee would have found the general workplace environment oppressive also. Daniels himself was the victim of racial taunts such as the nickname "Buckwheat" for the first ten years that he was employed at Essex. He asked his co-workers to back off, but, for the most part, he chose to turn the other cheek and endure the prejudice. These conditions place the hostile environment that emerged in the fall of 1987 into perspective. The appearance of the dummy did not represent an unexplainable aberration in a heretofore harmonious environment free of the taint of racial discrimination. Rather, the change in environment marked the outbreak of a more injurious

---

4. The Ku Klux Klan's effect on blacks calls to mind the example of a case in which only one isolated instance of harassment would be enough to establish the existence of a hostile work environment. If a black worker's colleagues came to work wearing the white hoods and robes of the Klan and proceeded to hold a cross-burning on the premises, all with the knowledge of the employer, this single incident would doubtless give rise to the employer's liability for racial harassment under Title VII.

strain of the virus of racism that had already infected the workplace.

As recounted above, when James Alexander, a black man, applied for a position at the Columbia City plant where Daniels worked, Alexander was discouraged by an Essex supervisor who described the workplace as "extremely prejudiced." Ultimately, Alexander did not obtain the job. Moreover, the scale-house wall, in addition to containing the personal slur against Daniels, showed the name "Reinaldo Gonzalez," an apparent reference to Daniels' co-worker Randy Heron, who "looked Mexican." *Daniels*, 740 F.Supp. at 558. Both of these examples help to fulfill the objective standard of a hostile work environment that provided fertile ground for an outgrowth of racial harassment. They serve to demonstrate that Daniels did not weave his allegations out of whole cloth, and bolster the confidence of the finder of fact in the plaintiff's veracity and in the objective reasonableness of his claims.

### 3. The employer's obligation to take remedial action

Having established that Daniels' injury was subjectively hurtful and objectively reasonable, we now consider the final predicate to liability for racial harassment in a hostile work environment. This Court has repeatedly recognized that an employer will be liable for discrimination by an employee "if the employer knew or should have known about an employee's acts of harassment and fails to take appropriate remedial action." *Brooms*, 881 F.2d at 421; *North v. Madison Area Ass'n for Retarded Citizens–Developmental Centers Corp.*, 844 F.2d 401, 407 (1988); *Hunter v. Allis–Chalmers*, 797 F.2d at 1422. The Supreme Court in *Meritor* hesitated to rule definitively on the standard for employer liability for harassment, but noted that the legislative history of Title VII demonstrates Congress's desire that courts look to common law agency principles. 477 U.S. at 72, 106 S.Ct. at 2408.

The record in this case is unambiguous so that there is no need to wrestle with traditional agency law principles to uphold a finding of liability on the part of Essex under an attenuated theory of respondeat superior. On the contrary, the district court expressly found that two management level employees, Daniels' supervisor Mike Rohrer and Vickie Churchward of the Personnel Department, heard plaintiff's complaints as to the specific instances of racial harassment. Each time Daniels approached his supervisor, Rohrer shrugged off his employee, admonishing him not to worry about the dummy or the graffiti. As for Churchward, Daniels notified her of the graffiti and complained of the racial harassment generally when he first notified her of his intent to resign. The defendant challenges plaintiff's version of what Rohrer and Churchward knew and when they knew it, but this goes to the witnesses' credibility and Essex may not reintroduce or reargue discredited testimony on appeal.

Although management had knowledge of the harassment directed at Daniels, it was less than diligent in taking remedial action. The dummy remained hanging in the doorway for at least eighteen hours after Daniels first spotted it and complained to Rohrer; the restroom graffiti reappeared two to three times after plaintiff first noticed it; and the scale-house wall still contained the racial slur against him as of the time that he left. In addition to dragging its feet on responding to the discrete acts, the defendant made virtually no effort to investigate the incidents, nor did Essex independently warn employees verbally or in writing that racial harassment would not be tolerated in the workplace. While Essex entered into a joint resolution with the employees' union condemning discrimination, Daniels denied that he ever saw it. If the joint resolution was issued at all, the district judge found that it was distributed to employees well after the events complained of by Daniels. The resolution does not count for sufficient remedial action on the part of the employer. As noted above, the district judge considered the resolution to be "a completely ineffective response to the racially discriminatory incidents." *Daniels*, 740 F.Supp. at 556–557 & n. 7.

## III. CONCLUSION

The law of racial harassment in a hostile work environment required us to conduct the foregoing three-pronged review. The clearly erroneous standard governing findings of fact, combined with the thorough examination of the factual record by the district court, made our review of the facts easy. The credibility determinations by the district court will remain undisturbed. As for the sufficiency of the evidence to establish racial harassment and hostile work environment, under objective and subjective standards plaintiff carried his burden to prove racial harassment and a hostile work environment by a preponderance of the evidence.

Because defendant has not appealed any aspect of the district court's damages award, the district court's judgment in favor of the plaintiff is affirmed in all respects.