James E. **RODGERS,** Plaintiff,

v.

**WESTERN–SOUTHERN LIFE INSURANCE COMPANY,** Defendant.

Civ. A. No. 89–C–484.

United States District Court, E.D. Wisconsin.

May 9, 1992.

James E. Rodgers, pro se.

Lawrence T. Lynch, Foley & Lardner, Milwaukee, Wis., for defendant.

## ·FINDINGS OF FACT AND CONCLUSIONS OF LAW

REYNOLDS, Senior District Judge.

*Background*

In 1973, pro se plaintiff James E. Rodgers ("Rodgers"), a forty-six-year-old black man, began working as a life insurance agent in defendant Western–Southern Life Insurance Company's ("Western–Southern") Milwaukee, Wisconsin office. In 1980, Rodgers was promoted to an associate sales manager position; on May 20, 1985, he resigned. On July 19, 1985, Rogers filed a timely charge of discrimination with the Wisconsin Equal Rights Division of the Department of Industry, Labor and Human Relations ("ERD"). On January 25, 1989, an ERD administrative law judge determined that Rodgers had failed to prove by a fair preponderance of the evidence that Western–Southern had violated the Wisconsin Fair Employment Act by discriminating against him on the basis of his race; on October 12, 1989, the Wisconsin Labor and Industry Review Commission affirmed the administrative law judge's decision.[1] On April 3, 1989, Rodgers received notice of his right to sue.

---

**1.** The ERD's determination has no preclusive effect on this court's trial of Rodger's Title VII complaint because that administrative decision was not reviewed by a state court. *Univ. of Tennessee v. Elliott,* 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986) (quoting *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)) (citation omitted). This rule holds true even where the plaintiff's Title VII claim is based on the same issues which were adjudicated by the state administrative agency. *Id.* The ERD decision is admissible as evidence, but this court retains discretion as to how much weight it is to be accorded. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 60, 94 S.Ct.

On April 27, 1989, Rodgers commenced this action against Western–Southern under Title VII of the Civil Rights Act of 1964, Title 42 United States Code § 2000e et seq., and the Fourteenth Amendment to the United States Constitution. Rodgers alleges in his terse complaint that Western–Southern discriminated against him on the basis of his race by creating a racially hostile environment and by constructively discharging him. On December 21, 1990, this court dismissed Rodgers' Fourteenth Amendment claim on the ground that Western–Southern is not a state actor. This court then held a bench trial on Rodgers' claims on January 8–9, 1991, during which Rodgers capably represented himself. For the reasons below, this court finds that Rodgers' supervisor at Western–Southern subjected him to unlawful racial harassment and that Western–Southern is therefore liable under Title VII.

### Findings of Fact

In 1965, when he was 19 years old, Rodgers moved from Arkansas to Milwaukee, Wisconsin. In 1973, after holding various jobs, Rodgers became an insurance sales agent in Western–Southern's Milwaukee office. From 1973 through 1985, Western–Southern's Milwaukee office employed roughly eighteen to twenty sales agents, four supervisors or associate sales managers, and one district manager. When Rodgers began working as a sales agent in 1973, four of the sales agents were black; that number increased to six or seven by the time Rodgers quit in 1985. Rodgers worked as a sales agent for seven years and under three different associate sales managers, all of whom were white. His duties as sales agent consisted of selling policies, collecting premiums, negotiating loans, and performing weekly and monthly accountings of the premiums he collected. According to all the testimony, Rodgers was one of the top-selling sales agents, winning membership in Western–Southern's "Million Dollar Club" six of the seven years he was employed as an agent, and he experienced no significant conflicts with any of the associate sales managers who supervised him while he worked as an agent.

In 1980, Rodgers was promoted to an associate sales manager position. At that point two blacks—Rodgers and Mark Thomas ("Thomas")—filled two of the four associate sales manager positions, and district manager William Mann ("Mann"), a white man in his mid-fifties and with twenty years experience at the firm, became Rodgers' immediate supervisor. Although it was Mann who had hired Rodgers and had made the decision to promote him to a managerial position, Mann was also the person who constantly directed work-disrupting epithets, and occasional racist comments, at Rodgers.

Rodgers' duties as an associate sales manager consisted of supervising five sales agents, reporting to district office manager Mann on a daily basis, assisting the sales agents in making sales, training new sales agents, and assisting the new agents to prepare for the state insurance sales licensing exam. On a typical day, Rodgers first received reports from the five sales agents under his supervision regarding their previous day's sales; at 10:00 a.m., he and the three other sales managers met with Mann in Mann's office to discuss sales results; at 11:00 a.m., Rodgers again met with his five sales agents to discuss their proposed sales route for the day; and in the afternoon, Rodgers worked in the field selling policies, collecting premiums, and responding to customer complaints. Rodgers and the other sales managers worked long hours, ordinarily from 9:00 a.m. to 9:00 p.m. weekdays, as well as some work on Saturdays and occasionally on Sundays. In addition to performing their own duties, the sales managers were responsible for handling "open accounts," that is, temporarily servicing any accounts vacated when one of the sales agents quit, until a replacement agent was hired.

It is undisputed that the daily meetings with Mann were unpleasant experiences,

---

1011, 1025, 39 L.Ed.2d 147 (1974). Having heard live testimony on all relevant issues at trial, this court attaches no weight to the ERD's administrative decision.

filled with profanity and negative comments. Western–Southern concedes that Mann regularly insulted the sales managers as a motivational technique (Western–Southern Br. in Supp. of Mot. for Summ. Judgment at 4). The parties agree that Mann routinely called the sales managers "knobheads," "knuckleheads," "dunderheads," and "goons," and other offensive names. Mann and several other employees also often referred to Rodgers as "rabbit." Mann claimed that Rodgers had obtained this nickname because of his quick physical mannerisms resembling those of a rabbit. Rodgers testified that Mann often used this term when he wanted to see Rodgers: Mann would step out of his office and yell "Rabbit, get in here," to the amusement of many of the other sales agents. Both Rodgers and Thomas convincingly testified that Mann's comments were not limited to such race-neutral epithets, however. Rodgers testified that Mann twice used the term "nigger" and Thomas recalled that Mann had used the term five to ten times during his tenure, although neither could recall the exact context in which Mann used the term. Rodgers recalled that Mann in 1985 made an explicitly racist comment about Rodgers' sales agents, all of whom were black (except for one short period when one of Rodgers' sales agents was white). Referring to Rodgers' agents, Mann stated in a bold, demanding tone that "You black guys are too f***ing dumb to be insurance agents" (Pl.Ex. 1). Mann conceded that he might have made this statement. Mann also admonished Rodgers on one occasion with the statement, "You must think you're back in Arkansas chasing jackrabbits," a comment which Rodgers not unreasonably construed as a racial slur intended to malign his black, southern heritage and to suggest that he should not have become an insurance agent. On another occasion, Mann told Rodgers that Mann's boss, divisional vice-president Dennis Lehman ("Lehman"), had advised Mann not to hire any more black agents.[2] Rodgers never confronted Mann regarding his

racially offensive comments, but on two occasions the comments upset him so much that he walked out of the meeting in quiet anger. Thomas, the other black sales manager, also never confronted Mann regarding his occasional use of racist commentary. After having heard Mann utter such racist statements on occasion, Rodgers testified that he began to read racist undertones into even the facially race-neutral epithets, such as "dunderhead," that Mann frequently used to describe Rodgers and his predominantly black subordinate sales agents. Rodgers also began to impute racial motives to many of Mann's business decisions.

During 1983, Rodgers began seeking outpatient medical treatment at a Milwaukee medical center for stress that he attributed at trial to the harsh treatment and racist language to which Mann subjected him. A notation in one of Rodgers' 1983 medical reports corroborates Rodgers' testimony in large part: "[Rodgers] [s]tates [that his] stress [is] mostly associated [with his] job—[he] works as [an] [assistant manager] of [an] insurance firm.... [His] [m]anager is [a] work-horse, always on his back, even though he does a good job—always 1st or 2nd in his district" (Deft.Ex. 512 at 10 (Medical Report)). Rodgers testified that the treatment improved his health somewhat, but that he stopped receiving the treatment after about one year because his harsh experiences every day at work limited its effectiveness.

Rodgers managed to continue working in this unpleasant work environment through 1985. During that year, however, Rodgers found that he could not cope with the pressures of an increased workload under the stress that Mann's unjustified negative commentary was already causing. During 1985, one of Mann's agents, Frank Kroutil quit, leaving Rodgers with an open account to service in addition to his other work. Thomas testified that it was not unusual for managers to have to service one, or sometimes even two, open accounts for ex-

---

**2.** Mann testified that he disregarded this advice in that four of the five agents he hired after this time were black.

tended periods. In March 1985, Mann increased the size of Rodgers' open account from $23,000 in average annualized premium to roughly $80,000. Although Rodgers suggested that Mann had increased the size of the open account to further his efforts to force Rodgers out of the company because of his race, the weight of the testimony indicates that Mann was simply trying to bring the size of the open account, which was then one of the smallest accounts in the office, into line with the size of the other nineteen accounts in the Milwaukee area. Thomas testified that the typical account had an average annual premium of around $80,000 and that Mann had changed the sizes of accounts in the past in order to achieve parity in account size. This court therefore finds that Mann's enlargement of Rodgers' open account was not racially motivated.

Around this time, Rodgers advised Mann of his continuing health problems and requested a reduction in his workload. Mann initially assured Rodgers that he could reduce his hours such that he would only need to service his accounts two nights per week. A few weeks later, Mann threatened to fire Rodgers because he was not spending enough hours servicing accounts; Mann also insisted that Rodgers henceforth submit daily reports of his work on the account. When Rodgers again complained about his workload, Mann replied to the effect that Rodgers was just crying because he had to "get up off his a** and work." During early May 1985, Mann advised Rodgers that one of Rodgers' agents, Michael Taylor ("Taylor"), would be fired because he had failed his licensing exam. The prospect of having to service a second open account led Rodgers to ask Mann orally to be demoted from sales manager to sales agent. Both Rodgers and Mann were aware that such a request was supposed to be made in writing, but Mann advised Rodgers that he would not consider such a request in any case, stating that Rodgers could either remain as a manager or quit. On May 20, 1985, Rodgers quit.

After Rodgers quit, Mann asked the other black manager, Thomas, to contact Rodgers. Two weeks later Thomas contacted Rodgers, but Rodgers stated that he would not return. Mann then retained Rodgers' subordinate Taylor, giving him another chance to pass the exam. Following his resignation, Rodgers worked for a few months for John Deere Insurance Company, and in 1987, began working as a job placement specialist with the Next–Door Foundation, a community service organization where he continued to work through the date of trial. In 1986, Mann transferred to the Indiana office.

This court finds that Mann's refusal to permit Rodgers to relinquish his management position or Mann's decision to retain Taylor, after initially threatening to fire him and to transfer his account to Rodgers, was not racially motivated. The testimony suggested instead that Mann sought to retain Rodgers as a manager and that Mann was forced to retain Taylor following Rodgers' resignation.

This court finds credible, however, Rodgers' claim that Mann's racist language significantly harmed Rodgers' work performance. The fact that Rodgers did not confront Mann immediately about his comments does not detract from the credibility of his claims, given Rodgers' nonconfrontational manner and Mann's abrasive character. Rodgers' failure to mention Mann's racist comments at his unemployment benefits hearing also does not undermine the credibility of his claim. After he quit, Rodgers applied for unemployment benefits, but at his July 22, 1985 hearing for unemployment benefits made no reference to Mann's racially derogatory comments. Rodgers credibly testified at trial that he made no such references during the benefits hearing because he did not want to encourage Mann to testify against his request for benefits. This testimony is corroborated by the fact that several days earlier, on July 19, 1985, Rodgers had already subscribed his administrative discrimination charge in which he complained of Mann's racially derogatory comments (Pl.Ex. 2). Further corroboration is found in Thomas' testimony to the effect that shortly after Rodgers quit, Rodgers informed Thomas that Mann's language had

bothered him and that he would not return to work. Finally, Rodgers credibly testified at trial that he was compelled to quit because of work-related stress resulting from a combination of (1) the increased work involved with servicing one, and the prospect of servicing a second, open account and (2) Mann's use of derogatory and racially offensive language.

## Analysis

### I. Standards Governing Existence of Hostile Work Environment Discrimination

Title VII prohibits an employer from engaging in racial harassment that creates a hostile or offensive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Patterson v. McLean Credit Union,* 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989); *Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1270 (7th Cir.1991). In *Meritor* the Supreme Court noted that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2405 (citing *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)). In *Rogers,* the Court of Appeals for the Fifth Circuit provided a persuasive justification for according such an expansive reach to Title VII:

> [T]he phrase 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.... One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers....

454 F.2d at 238, *quoted in Meritor,* 477 U.S. at 66, 106 S.Ct. at 2405. Accordingly, the Court of Appeals for the Seventh Circuit has repeatedly recognized that racial harassment provides a basis for an independent claim under Title VII. *Daniels,* 937 F.2d at 1270.

The court of appeals has instructed district courts to evaluate Title VII racial harassment claims under both an objective and a subjective standard. *Daniels,* 937 F.2d at 1271–72. The court of appeals has articulated this legal inquiry as follows:

> [A] district court must employ a dual standard when evaluating a Title VII sexual [or racial] harassment claim, considering the likely effect of a defendant's conduct upon a reasonable person's ability to perform his or her work and upon his or her well-being, as well as the actual effect upon the particular plaintiff bringing the claim.

*Daniels,* 937 F.2d at 1271–1272 (quoting *Brooms v. Regal Tube Co.,* 881 F.2d 412, 419 (7th Cir.1989)) (bracketed language in *Daniels*). In applying the subjective standard the district court must:

> give proper weight to the employee's injury in fact, acknowledging the different ways in which a plaintiff initially responds to or copes with harassment. The employee may quit "cold turkey" or ... may experience a prolonged period of turmoil....

*Id.* at 1272. In applying the objective standard, the district court must consider a range of factors to determine the reasonableness of the plaintiff's harassment or hostile working environment claim, including:

> the nature of the alleged harassment, the background and experience of the plaintiff, her coworkers, and supervisors, the totality of the physical environment of the plaintiff's work area, the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs, coupled with the reasonable expectation of the plaintiff upon voluntarily entering that environment.

*Daniels,* 937 F.2d at 1274. The court of appeals has emphasized that in making this objective determination, the district court must avoid placing undue weight on the simple number of harassing incidents inflicted upon the plaintiff:

> The number of instances of harassment is but one factor to be considered in the

examination of the totality of the circumstances. A Title VII plaintiff does not prove racial harassment or the existence of a hostile working environment by alleging some "magic" threshold number of incidents. Conversely, an employer may not rebut a claim simply by saying that the number of incidents alleged is too few.

*Id.* at 1273–74.

## II. Application of Legal Standard to Rodgers' Work Environment

### A. *Application of Subjective Standard*

■ Mann's constant verbal abuse, particularly his racist comments, undeniably had a profound psychological effect upon Rodgers. Even though much of Mann's verbal abuse was race-neutral, Mann's racist comments to Rodgers were so degrading that they made Rodgers feel as though Mann questioned Rodgers' professional competence because of his race. In addition, instead of diluting the effect of the racist commentary, Mann's neutral derogatory remark had the opposite effect; Rodgers' testimony suggested that even the neutral comments reduced his self-esteem and ability to work, making Mann's racist references, epithets, and comments even more lethal to Rodgers' ability to perform his job.

First, Rodgers was deeply offended by Mann's use of the term "nigger," even though Mann might not have directed that epithet at Rodgers personally. Rodgers also took Mann's statement, "You must think you're back in Arkansas chasing jack-rabbits," as a racial slur intended to malign his black, southern heritage and to suggest that he was out of his element as an insurance agent. Rodgers also took Mann's declaration: "You black guys are too f***ing dumb to be insurance agents," even though it was directed at Rodgers' black sales agents, to imply that he was not qualified to be an insurance agent because of his race. Finally, Rodgers found offensive Mann's unnecessary statement that the divisional vice-president had advised Mann not to hire any more black agents. These statements undoubtedly encouraged Rodg-

ers to view even Mann's race-neutral decisions, such as his decision to transfer business to Rodgers' open account, as racially-motivated efforts to force Rodgers out of the company.

Mann's harassment contributed significantly to Rodgers' debilitated state as of the Spring of 1985. Although the stress that Rodgers felt did not reach a breaking point until that time, Rodgers had already begun to feel the work-disrupting effects of Mann's abuse as early as 1983, when it caused him to seek stress counseling. Rodgers' medical records from 1983, which refer only to his complaints of "occupationally-related stress" and his statement that Mann treated him unduly harshly, do not reflect the independent effect of Mann's racist commentary upon Rodgers' psychological well-being. However, the fact that Mann's general comments caused Rodgers to seek counseling even in 1983, when his workload was not unusually heavy, indicates the harm that Mann's statements generally caused Rodgers. Moreover, in the medical report accompanying Rogers' application for unemployment benefits, Dr. Greg Reiser, M.D., ("Dr. Reiser") noted that Rodgers had "developed a variety of stress[-]related complaints as a result of his work load [*and*] *stress caused by his job. His reactions were appropriate and he needs stress counseling.*" (Deft.Ex. 512 at 1). Dr. Reiser's 1985 examination thus revealed that the work environment was an independent factor, in addition to Rodgers' heavy workload, which contributed to his stress disorder. Rodgers himself noted at his unemployment benefits hearing that he had been experiencing work-related stress for a number of years, but that by May 1985, this stress became so great that it prevented him from "work[ing] effectively" (Oct. 1, 1990 Larry Lynch Aff., Ex. I at 1 (July 22, 1985 Unem. Comp.Hrng.Tr. at 4)). Finally, Rodgers testified convincingly at trial that the racist comments harmed his self-esteem.

Rodgers has thus met his burden under the subjective standard. Although the work pressures during the Spring of 1985 no doubt contributed significantly to the timing of Rodgers' resignation, the verbal

abuse that Rodgers' suffered while working under Mann eroded Rodgers' ability to withstand those increased work pressures. Mann's racist comments and taunts contributed significantly to the stress condition that prevented Rodgers from continuing to perform his job.

### B. Application of Objective Standard

Mann's verbal abuse would also have "adversely affected the work performance and well-being of a reasonable person." *Daniels*, 937 F.2d at 1274 (*quoting Daniels v. Essex Group, Inc.*, 740 F.Supp. 553, 560 (N.D.Ind.1990)). Although the record does not disclose the exact number of racist comments that Mann made either to Rodgers or in his presence, they would have adversely affected the performance of a reasonable employee, given their content and context. Mann's use of the term "nigger," for example, even if not directed at the employee, reasonably suggests that Mann lacked respect for blacks. A reasonable employee would find even more degrading Mann's suggestion that blacks were "too f***ing stupid" to do insurance work, to the extent that it demeans the employee's mental abilities and professional competence solely on the basis of the employee's race. A reasonable black employee would take such a statement to imply that people of his race had little future with the company, particularly after having been gratuitously[3] informed that management had decided to stop hiring black sales agents.

### Conclusion on Liability Issue

■ Although Title VII is not intended to be a "clean language" act, an employer may not hide truly racist comments behind a thicket of race-neutral insults and profanities. It would be incongruous to award Title VII damages to an employee whose employer used predominantly acceptable language punctuated with occasional racist taunts while denying damages to the employee whose employer mixes such racist taunts into a daily routine of race-neutral degradation. This court therefore concludes that Mann's racist comments to Rodgers were so racially derogatory that they impaired his ability to do his job and would have similarly affected any reasonable employee. Such racial harassment by a supervisor at a decision-making level in the corporate hierarchy constitutes racial harassment by the corporation, regardless of the extent of the corporation's actual or constructive knowledge of the supervisor's unlawful actions. *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1422 (7th Cir. 1986) (dicta). Western–Southern is therefore liable under Title VII for Mann's deliberate verbal harassment of Rodgers on account of his race.

### Remedies

Rodgers seeks compensation for his lost back pay, job reinstatement, and attorney's fees (Pl. Final Pretrial Rept.).

■ This court will award Rodgers back pay and order his reinstatement pursuant to 42 U.S.C. § 2000e–5(g). Western–Southern must pay Rodgers back pay for the period from the date of resignation, May 20, 1985, to the date on which he is (1) reinstated or (2) declines the offer of reinstatement. *See EEOC v. Enterprise Assoc. Steamfitters Local No. 638*, 542 F.2d 579, 590 (2d Cir.1976) (back pay period ends on date of reinstatement). Rodgers bears the burden of establishing the back pay to which he is entitled for this period. *Hanna v. Am. Motors Corp.*, 724 F.2d 1300, 1307 (7th Cir), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984). Any pay (other than unemployment compensation)[4] that Rodgers earned or could have

---

**3.** Western–Southern has not even attempted to argue that Mann's statement regarding the company's decision to hire no more black agents served any purpose other then to offend Rodgers. According to the testimony, Mann alone was responsible for making hiring decisions in the Milwaukee office and had no business reason for advising Rodgers of this anti-black hiring policy. Under the circumstances, this court finds that the statement was intended to harass Rodgers.

**4.** Any unemployment compensation payments that Rodgers received need not be deducted from his back pay award, and this court declines to require such deductions here. *EEOC*

earned with reasonable diligence during any periods of unemployment following his resignation shall "operate to reduce the back pay otherwise allowable," 42 U.S.C. § 2000e–5(g), but Western–Southern bears the burden of proof on this mitigation issue. *Hanna,* 724 F.2d at 1307. To prevail on the mitigation issue, Western–Southern must prove both that Rodgers failed to exercise reasonable diligence in seeking employment, and that with the exercise of reasonable diligence he would have had a reasonable chance of finding (and keeping, given his physical and psychological condition following his resignation) employment comparable to his position at Western–Southern. *Id.* Western–Southern must show, for example, that during such periods Rodgers failed to check want ads, register with employment agencies, or apply for any jobs. *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1234 (7th Cir.1986). The current record is insufficient to permit this court to compute the amount of back pay to which Rodgers is entitled under these standards. Rodgers is therefore ordered to serve upon Western–Southern and to file within fourteen (14) days of the date of this order records documenting his annual earnings (1) from his job at Western–Southern for 1981–1984 and for January–April 1985, and (2) from any jobs held from June 1985 to date. Rodgers may include his tax returns for these periods among these materials. For any periods during which Rogers was unemployed, he may also briefly state (in the form of an affidavit) what efforts he made to secure employment, i.e., whether he checked want ads, registered with employment agencies, or applied for any jobs. Rodgers must also submit an accounting of five pages or less setting forth the back pay to which he claims he is entitled. Within ten days after service of Rodgers' records, Western–Southern may file up to a total of ten pages of argument and/or accountings as well as any amount of necessary documentary evidence limited to the issue of the amount of back pay Rodgers is due.

This court also orders that Western–Southern reinstate Rodgers as either an associate sales manager or as a sales agent, whichever position Rodgers chooses (if Rodgers would still like to be reinstated at all). Rodgers shall therefore file and serve upon Western–Southern within fourteen (14) days of the date of this order a brief statement (no more than one page) indicating whether he still seeks reinstatement, and if so, which of the two positions he seeks.

■ Title 42 U.S.C. § 2000e–5(k) does not authorize an award of attorney's fees to a prevailing pro se plaintiff, however. By its terms, the statute provides only for an award of an "attorney's fee"; had Congress intended to authorize pro se litigants to recover fees for time and effort expended in enforcing the statute, Congress would have specified that both attorneys and non-attorneys are entitled to such fees rather than denominating the award as one for an "attorney's fee." 42 U.S.C. § 2000e–5(k); *see DeBold v. Stimson,* 735 F.2d 1037, 1043 (7th Cir.1984) (denying prevailing pro se plaintiff attorney fees under Freedom of Information Act under similar analysis). Moreover, if the purpose of the fee-shifting provision of Title VII is akin to that of Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988—to encourage a wronged person to retain a lawyer—then awarding attorney's fees to a pro se plaintiff would not serve (and might actually conflict with) this purpose. *Cofield v. City of Atlanta,* 648 F.2d 986, 988 (5th Cir. Unit B 1981). Rodgers' request for attorney fees is therefore denied.

IT IS THEREFORE ORDERED that this court finds against defendant Western–Southern Life Insurance Company and in favor of plaintiff James E. Rodgers in an amount to be determined by this court following the submissions of the parties.

IT IS FURTHER ORDERED that within fourteen days of the date of this order, plaintiff Rodgers shall file and serve upon defendant Western–Southern Life Insur-

*v. O'Grady,* 857 F.2d 383, 389 (7th Cir.1988) (dicta); *Hunter,* 797 F.2d 1417, 1429 (7th Cir. 1986).

ance Company records documenting his annual employment earnings (1) at Western–Southern for 1981–1984 and for January–April 1985, and (2) from any jobs held from June 1985 to date. For any periods during which Rogers was unemployed, he may also briefly state by affidavit what efforts he made to secure employment. Rodgers shall submit along with these documents an accounting of five pages or less setting forth the total amount of back pay to which he claims to be entitled.

IT IS FURTHER ORDERED that within fourteen days of the date of this order, plaintiff Rodgers shall file and serve upon defendant a statement of no more than one page indicating whether he still seeks reinstatement, and if so, whether he seeks reinstatement as an associate sales manager or as a sales agent.

IT IS FURTHER ORDERED that within ten days of receipt of plaintiff Rodgers' above-described submissions, defendant Western–Southern Life Insurance Co. may file up to a total of ten pages of argument and/or accountings as well as any amount of necessary documentary evidence limited to the issue of the amount of back pay Rodgers is due.

IT IS FURTHER ORDERED that plaintiff Rodgers' request for attorney fees is DENIED.