**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**ST. MICHAEL HOSPITAL OF FRANCISCAN SISTERS, MILWAUKEE, INC., Defendant.**

**Civil Action No. 96–C–1428.**

United States District Court, E.D. Wisconsin.

March 31, 1998.

Reuben Daniels, Regional Atty., E.E.O.C., Washington, DC, Barbara L. Henderson, Henry Hamilton III, Laurie F. Vasichek, E.E.O.C., Milwaukee, WI, for Plaintiff.

Scott C. Beightol, Steven S. Gensler, Michael Best & Friedrich, Milwaukee, WI, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

REYNOLDS, District Judge.

In this lawsuit, the plaintiff Equal Employment Opportunity Commission ("EEOC") alleges that the defendant St. Michael Hospital of Franciscan Sisters, Milwaukee, Inc. ("St.Michael") discriminated against Connie Johnson ("Johnson"), a former employee of St. Michael. Specifically, the EEOC claims that St. Michael disciplined, refused to transfer, and ultimately discharged Johnson because she is an African–American (disparate treatment) and because she had leveled claims of discrimination against St. Michael (retaliation). Finally, the EEOC alleges that St. Michael subjected Johnson to a racially hostile work environment. These allegations are within the ambit of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

Currently before the court are two motions for summary judgment on behalf of St. Michael. The first, filed June 12, 1997, seeks dismissal of the hostile environment claim and all claims rooted in allegations of retaliatory, rather than racial, intent. The premise of this motion is that these claims were not included within Johnson's EEOC charge of discrimination, and are therefore now untimely. St. Michael's second motion for summary judgment, filed August 29, 1997, substantively attacks the claims that Johnson was disciplined and discharged because of

her race, was denied a transfer because of her race and in retaliation for her complaints of racism, and that Johnson was subjected to a racially hostile work environment. Currently, St. Michael makes only the procedural attack on the retaliatory discipline and discharge claims. The court finds that all of the claims in this suit are timely and that St. Michael's substantive challenges succeed only with regard to the claim that Johnson was denied a transfer based on her race. St. Michael's motions shall be denied in all other respects.

## FACTUAL BACKGROUND

St. Michael is a health care provider located on Villard Avenue in the city of Milwaukee, Wisconsin. One aspect of St. Michael's business is its Family Health Care Center ("FCC") where patients receive family practice health services. Johnson began work for St. Michael as a temporary Medical Assistant in May of 1987. In 1988, Johnson assumed this position on a permanent basis. Johnson held this position until her discharge on October 29, 1992.

The facts submitted for the purposes of these motions, if true, illustrate that several white St. Michael employees were in the habit of making frequent comments of a racial nature. Two employees, Jeanne Ewens and Wendy Seitz, who were allegedly most offensive in this regard, left the employ of St. Michael in 1989 and 1990 respectively.

The following is not exhaustive but illustrates the nature of some of the commentary:

- African–American employees and patients were referred to as "you people."

- Johnson was told that it is more difficult to give injections to African–American patients because their "skin is tougher" than that of white patients.

- Indeed, Johnson was once asked to draw blood from her own "kind," i.e. African–American patients.

- More than once, Johnson was asked by white coworkers to "interpret" what African–American patients were saying.

- One particular coworker, Jeanne Ewes, was in the habit of making racial comments: informing African–American employees when fried chicken or watermelon was being served in the cafeteria and referring to cleaning floors as "nigger work"; and, at least once, such a comment occurred in front of a nurse supervisor who said nothing. When asked to desist, Ewens declared that she would "kiss nobody's black ass." While St. Michael instructed Ewens to overcome her interpersonal problems with Johnson, she was never subject to discipline for her racial comments.

Johnson's verbal complaints to management did not resolve these problems. As early as August 18, 1989, Johnson made a written complaint to management about this racially-oriented behavior. No evidence suggests that St. Michael either investigated the complaint or took steps to address it.

After Ewens and Seitz had left St. Michael, another employee, Sally Anello, continued the racial commentary.

In 1991, Judy Wendel was promoted to the position of nurse manager, Johnson's supervisor. Wendel made racial comments both before and after she was promoted. For example, there is evidence that she made frequent comments that indicated her belief that African–Americans were unintelligent and do not speak "proper" English.

In January 1992, Johnson's coworker, Cheryl Serio, overheard an alleged discussion between Wendel and another worker, Donna Martinez, about St. Michael's hiring practices, which Serio felt was discriminatory in nature. Specifically, Martinez suggested ways to avoid hiring "troublemakers" like "Connie [Johnson]" and several other African–American employees. While Wendel said nothing during this alleged exchange, Serio saw Wendel nodding in apparent agreement. Both Wendel and Martinez deny such conversation ever took place.

Serio related what she heard to Johnson. Several days later, Johnson tape-recorded Serio's account and presented the tape to FCC Medical Director David Smith. Smith cautioned Wendel about racially-oriented comments. Wendel, in turn, expressed her dismay to Johnson that Johnson had taken this issue to Dr. Smith and not to Wendel

herself. Wendel expressed a similar sentiment to Serio and threatened Serio's job if Serio repeated the discussion to anyone else.

Wendel recorded in Serio's performance log that this incident marked the beginning of a lot of "discord among employees in FCC and destroyed my trust and confidence in Cheryl [Serio]." Wendel eventually terminated Serio in January 1993. Shortly after the tape incident, the FCC Business Manager, Ross Stein, had received information indicating that Wendel was engaging in racial discrimination. In response, he interviewed the FCC's African–American employees. Within a day of these interviews, Dr. Smith requested Stein's resignation on the grounds that Stein "was promoting racial turmoil." Stein resigned on March 27, 1992.

In June 1992, Johnson complained to Wendel about statements made by Sally Anello that Johnson had taken to be racially offensive. In particular, Johnson heard Anello tell Serio to "keep practicing on blacks" in response to Serio's request to practice drawing blood on Anello. Wendel instructed Johnson' not be defensive and reminded Johnson of the incident involving the tape recording Johnson had made with Serio. Shortly after this conversation, Wendel summoned Johnson and chastised her for misinterpreting Anello's comment. Wendel told Johnson to apologize to Anello and Johnson refused. At this point, Wendel tossed an employee manual across a desk toward Johnson and ordered Johnson to seek psychological counseling for her "problem." As for Anello, her performance evaluation reflected that Anello was told to be more cognizant of how her comments might be interpreted.

Wendel's June 1992 performance log for Johnson stated: "This is not a racial issue! We need a plan!—A strong front!" By this point, Wendel was summoning Johnson to daily meetings· and subjecting Johnson to verbal discipline that Johnson perceived as demeaning. Johnson was seen leaving one of these meetings in tears. Wendel also asked other employees about Johnson.

By this point, Johnson decided that her best option might be to apply for the recently posted position of Patient Accounts Representative ("PAR"). While this position was not a ·promotion in terms of pay, hours, or benefits, it was not supervised by Wendel. Johnson informed Cynthia Jurishica, the person who replaced Stein as the FCC's business manager, of her interest in the PAR position. Soon after, Jurishica interviewed Johnson for the position. While there are some disputes over Johnson's relevant experience, during the interview, Jurishica stated that Johnson's training for the position would not take long because Johnson was already familiar with the PAR's responsibilities. However, Jurishica has testified that she never considered Johnson to be a suitable candidate because of the manner in which she perceived Johnson to interact with others. Nonetheless, at first she did not completely rule Johnson out of the running. On July 10, 1992, Dr. Smith interviewed Johnson. Dr. Smith expressed his desire to hire someone with billing experience. Although Johnson described her experience to Dr. Smith, Johnson felt that she would not be offered the job. On September 4, 1992, Jurishica informed Johnson that Johnson was no longer in the running for the PAR position. The depth of Jurishica's knowledge about Johnson's complaints of racism is in dispute, but it is undisputed that she had discussed Johnson's candidacy with Wendel.

St. Michael's hiring policy favors internal transfers over hiring from the outside and, through September 4, 1992, Johnson was the only internal candidate. On September 11, 1992, Shiela Riley, a white St. Michael employee, applied for the PAR position, at the suggestion of Jill Schwieters, St. Michael's employment supervisor, and was hired shortly thereafter.

Various members of St. Michael's management have proffered reasons for Riley being hired over Johnson including deficiencies in Johnson's experience, Johnson's disciplinary record including warnings associated with attendance problems, the belief that Johnson was "too aggressive" yet not "assertive," and because Riley had more experience. Throughout her work at St. Michael, Johnson's employment evaluations reflected both very positive reviews of her work and criticisms of her "attitude" and her behavior towards coworkers.

On July 7, 1992, Dr. Smith gave Johnson a memo directing Johnson to bring concerns related to nursing to Wendel and other concerns to Jurishica. Three days after this memo issued, Wendel disciplined Johnson in writing for not recognizing Johnson's own responsibility for problems in the workplace. An example given was Johnson's interpretation of Anello's comments as racially oriented. Johnson received further criticism for airing complaints outside the avenues outlined in Smith's July 7 memo. On October 13, 1992, Johnson received a second written reprimand cataloging a variety of Johnson's alleged misdeeds. The first involved Johnson's involvement in a telephone call between another employee, Janice McCaskey, and a patient. Johnson was also reprimanded for telling employee Princella Turner to "watch out" for Wendel and for asking a new African–American employee how a meeting between that employee and Jurishica went. Finally, Wendel stated that Johnson had refused to do work in the medical records department. This allegation stemmed from a division of duties Johnson had reached with a coworker that would prevent Johnson from having to bend, thus aggravating pain in Johnson's back. Though the coworker agreed with the arrangement, Wendel alleged that the coworker had complained. Wendel refused Johnson's request that the coworker be called to meet with them. Finally, Johnson contravened Wendel's orders not to speak with the coworker about the incident. In sum, the factual bases of most, if not all, of these incidents are in dispute.

Wendel fired Johnson on October 29, 1992. Johnson's termination notice refers to allegedly unauthorized overtime. Johnson alleges that other employees did not suffer the same restrictions on overtime that she did. The termination notice also criticized Johnson for allegedly telling coworkers that she, Johnson, was the only employee not being paid for overtime. Another aspect of Johnson's termination involved her use of one of the FCC's sample asthma inhalers. St. Michael had no policy regarding employee use of prescription drug samples and there is a dispute as to whether Johnson was singled out for disciplinary action on this score. Finally, Johnson's notice of termination did not comport with St. Michael's policy of documenting a terminated employee's averaged work evaluations on the notice. Throughout these series of disciplinary measures, Wendel's discipline of Johnson sometimes followed days or weeks behind the incident in question. Further, there is a genuine dispute as to whether Johnson suffered discipline more often and with more severity than other employees who were alleged to have engaged in like conduct.

## The EEOC Charge

On October 27, 1992, two days before she was terminated, Johnson initiated the process of filing a charge with the EEOC. On November 6, 1992, Johnson signed the charge with the EEOC, alleging racial discrimination related to (1) discipline she received on July 10 and October 13, 1992, and to (2) St. Michael's denying her a transfer to the position of Patient Accounts Representative on or about September 4, 1992. On August 24, 1993, Johnson amended this charge to add a reference to her October 29, 1992 discharge; the amended charge referenced only racial discrimination and not retaliatory motive by St. Michael. However, when Johnson initially approached the EEOC, she indicated on the EEOC's intake form that she believed herself to be a victim of racial discrimination, retaliation, and harassment. Further, Johnson indicated on her intake questionnaire that she felt entitled to damages for the "harassment" she suffered. It is undisputed that this charge, as amended, placed at issue in a timely fashion, racial discrimination in relation to discipline, denial of transfer, and discharge. The charge, itself, was not amended to specifically reference retaliatory motive until June of 1996. The race discrimination and the retaliation claims challenge the same employment actions. At no time did the formal charge reflect allegations of a racially hostile work environment.

Despite the fact that retaliation was not specifically articulated in the formal EEOC charge until June 1996, St. Michael was made aware that the EEOC was pursuing in its investigation all of the theories now at issue. At a June 24, 1994 meeting EEOC investiga-

tor Maria Flores so informed Dr. Smith, Employment Supervisor · Schwieters, and Nurse Manager Judy Wendel. Further, Flores expressed the EEOC's concern over racial remarks Johnson was alleged to have suffered throughout her work at St. Michael. All · three theories—discrimination, retaliation, and hostile environment—were discussed at Johnson's intake interview with EEOC investigator Donna Brey. Based on this interview, Brey prepared a formal charge and affidavit for Johnson's signature. As described above, these expressed, at first, only a discriminatory treatment theory. However, all three theories were the subject of the EEOC's conciliation attempts with St. Michael and the EEOC's September 24, 1996 letter of determination which found reasonable cause to believe that Johnson had been (1) discriminated against on account of her race, (2) subjected to unlawful retaliation, and (3) subjected to a racially hostile work environment.

## SUMMARY JUDGMENT STANDARD

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To avoid summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Even if some facts are in dispute, entry of summary judgment is in order if the movant either establishes uncontroverted facts entitling it to summary judgment or demonstrates that the non-moving party has failed to make a sufficient showing on an essential element of its

case with respect to which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

To determine whether material facts are disputed so as to preclude the entry of summary judgment, the court relies on the parties' proposed findings of fact. *See generally* Local Rule 6.05 (E.D.Wis.). The moving party must submit detailed factual propositions in accordance with Local Rule 6.05(a). The non-moving party must specifically respond to movant's proposed findings; if findings are disputed, evidentiary support for the dispute must be cited. Local Rule 6.05(b)(1). A responding party may also submit additional factual propositions. Local Rule 6.05(b)(2). When there is no objection to proposed findings of fact, the court accepts them as true. Local Rule 6.05(d). At its core, this is the stage of the litigation in which parties are required to demonstrate that they have sufficient relevant evidence to offer to allow a jury to apply the law and find in their favor.

## DISCUSSION

### A. *The Timeliness of the Charge*

■ A technical failing on Johnson's part does not strip the EEOC of the power to carry out its Congressionally mandated duties. The court's review of the applicable authorities indicates that the scope of an EEOC enforcement lawsuit is not so stringently circumscribed by Johnson's initial charge as St. Michael urges. The EEOC's litigation of the retaliation and racially hostile environment claims is not barred by the fact that Johnson failed to specifically include them in her original charge.

An EEOC investigation begins with a charge filed with that agency. 42 U.S.C. § 2000e–5(b). Charges may be filed either by an·"aggrieved individual" or by an EEOC commissioner, and the employer so charged must be notified. The EEOC may find no merit to the ·charge and issue to the aggrieved individual notice of the EEOC's findings and of the individual's right to pursue the matter privately by way of a lawsuit. Where, as in this case, the EEOC finds merit in the individual's charges, the EEOC must

issue a letter of determination stating so and must attempt to reach a "conciliation" with the employer satisfactory to the EEOC. Failing conciliation, the EEOC may bring suit in federal court. The crux of St. Michael's first motion is the assertion that the substance of the EEOC's civil complaint should be delineated by Johnson's administrative charge.

 The general rule is that a claim must be processed through the EEOC's administrative machinery and therefore must be included on the administrative charge. However, three factors have persuaded the courts to interpret the scope of the initial administrative charge with some lenity regardless of whether the civil plaintiff is an individual or the EEOC. First, in most cases the charging party is a layperson whom it would be unfair to hold to strict drafting standards. Second, Title VII is to be construed broadly so as to effectuate its remedial purposes. *Jenkins v. Blue Cross Mutual Hosp. Ins., Inc.,* 538 F.2d 164 (7th Cir.1976). Where, as in this case, the EEOC has administratively found cause to believe that the law has been violated, a third factor is noteworthy: unlike in most judicial proceedings from an administrative decision, in a Title VII lawsuit, the employer/defendant is entitled to a trial *de novo* wherein the EEOC bears the typical burdens for a civil suit. *See EEOC v. Chicago Miniature Lamp Works,* 526 F.Supp. 974 (N.D.Ill.1981). At stake for an employer during the pre-litigation phase of an EEOC charge is the opportunity to conciliate, not an entitlement to an adjudication of the charge. *See EEOC v. St. Anne's Hospital,* 664 F.2d 128, 130 (7th Cir.1981).

In a typical civil suit, of course, a civil complaint delineates the parameters of the case. While other civil plaintiffs do not face the administrative prerequisites to litigation that Title VII plaintiffs do, it is vital to recognize that the administrative processes mandated by Title VII are intended to provide a vehicle for dispute resolution without the need of a civil lawsuit. Thus, it is one thing to require that claims of discrimination be subjected to the conciliation and determination procedures. It is another matter, however, to read the charge with pained narrowness when, in fact, all of the claims at issue have been the subject of the procedures the charge is intended to trigger. When the conciliation and determination procedures have been followed, an overly narrow reading of the charge would, in fact, turn Title VII on its head by making a procedure designed to effectuate efficient resolution, a hurdle that serves only to make the layperson's task more difficult. The benefit an employer may derive from the administrative prerequisites is that the charge against it may be resolved short of expensive litigation. *See Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 366, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977) (Title VII seeks to leave open all avenues for "quick and effective relief"). Where an employer, however, has had this opportunity, it is difficult to discern any great entitlement the employer has to having the administrative prerequisites imposed on the plaintiff in an overly mechanical fashion. *See St. Anne's,* 664 F.2d at 130 ("reasonable cause" determination is not adjudication of claim).

 In *Jenkins,* the Seventh Circuit held that a private discrimination plaintiff may litigate in court those claims "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins,* 538 F.2d at 167 (*quoting Danner v. Phillips Petroleum Co.,* 447 F.2d 159, 162 (5th Cir.1971)). At issue in the case at bar is whether this rule applies when the civil plaintiff is the EEOC rather than an individual. The case law is muddled with a majority either eschewing the "like or reasonably related" requirement or applying it more broadly when the EEOC is the plaintiff. Taken together, the practical effect of these authorities is that the EEOC is empowered to sue on any violations of law that the EEOC could be expected to find during a reasonable investigation of the initial charge.

 St. Michael for its part appears incredulous that the EEOC would be treated differently than a private, individual plaintiff in a civil lawsuit. This incredulity is gratuitous—a private, individual plaintiff seeks to vindicate his or her rights and obtain compensation for any breach thereof; the EEOC as plaintiff may subsume this mission but only in the course of vindicating federal law on behalf of the public. To state the obvious,

the EEOC is charged the duty of enforcing Title VII; a private plaintiff is not. *See EEOC v. Harvey L. Walner and Associates,* 91 F.3d 963, 967–68 (7th Cir.1996) (EEOC enforcement powers designed to supplement rather than replace private litigation). To limit a private plaintiff's remedies based on that individual's charge creates a cost for that individual. To hold that the EEOC is similarly limited by the individual's charge creates a cost for the public.

The power Congress afforded the EEOC illustrates this difference. *See* 42 U.S.C. § 2000e–4 and § 2000e–5. Most relevant is the fact that the EEOC's investigation, initiated by an aggrieved individual's charge, is not limited by the scope of that charge: a "single charge may launch a full scale inquiry." *Jenkins,* 538 F.2d at 168 (*quoting Motorola, Inc. v. McLain,* 484 F.2d 1339, 1346 (7th Cir.1973)). The EEOC is free to, indeed has the duty to, pursue evidence of any unlawful actions within its jurisdiction. This would be meaningless if, in the end, the remedies available to the EEOC were limited by the scope of the private individual's charge.

On the other hand, if during its investigation of an individual's charge the EEOC finds evidence of uncharged illegal acts, the EEOC could file a Commissioner's charge. 42 U.S.C. § 2000e–5(f). However, the difference this would create in a case such as the one at bar is illusory. Here, St. Michael was informed of the breadth of the EEOC investigation, St. Michael was asked to conciliate all of the charges now at issue, and the EEOC included all of these charges in its determination of reasonable cause. There is nothing magical about an EEOC charge. It serves as the procedural vehicle for triggering Title VII's administrative features in an effort to resolve a Title VII claim short of litigation. As these features were properly applied in this case as to all claims, requiring the EEOC to have filed a charge separate from Johnson's would be a meaningless hurdle, one that would convolute the process that Congress so carefully designed to afford resolution in an efficient manner.

The first major decision to recognize that the EEOC can pursue in court claims not specifically enumerated in an administrative charge was *EEOC v. General Elec. Co.:*

> If the EEOC uncovers during that investigation facts which support a charge of another discrimination than that in the filed charge, it is neither obliged to cast a blind eye over such discrimination nor to sever those facts and the discrimination so shown from the investigation in process and file a Commissioner's charge thereon, thereby beginning again a repetitive investigation of the same facts already developed in the ongoing investigation. To cast a blanket over such facts in the ongoing proceedings would be a violation of the EEOC's statutory obligation in the area of employment discrimination. To require a new charge based on those facts and to begin again the administrative process thereon, would result in an inexcusable waste of valuable administrative resources and an intolerable delay in the enforcement of rights which require a "timely and effective remedy" .... [T]he original charge is sufficient to support action by the EEOC as well as a civil suit under the Act for any discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge, provided such discrimination was included in the reasonable cause determination of the EEOC and was followed by compliance with the conciliation procedures fixed in the Act.

532 F.2d 359, 365–66 (4th Cir.1976) (footnotes containing citations omitted).

The Fourth Circuit's approach was cited with approval by the Supreme Court in *General Telephone Co. v. EEOC,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), which declined to hold the EEOC to Fed.R.Civ.P. 23's class action requirements. The Supreme Court reasoned that Rule 23's "typicality" requirement, which limits a class's claims to those encompassed by the named plaintiff's claims, would narrow the EEOC enforcement role in a manner inconsistent with Title VII. Specifically, application of Rule 23 to EEOC lawsuits would defeat the EEOC's duty to pursue "[a]ny violations that the EEOC ascertains in the course of a reasonable investigation of the charging par-

ty's complaint." *General Telephone*, 446 U.S. at 331, 100 S.Ct. 1698.

■ The relevant limit on the EEOC, therefore, is not the scope of the charge but the scope of a reasonable investigation of that charge. For example, the EEOC "may, to the extent warranted by an investigation reasonably related in scope to the allegations of the underlying charge, seek relief on behalf of individuals beyond the charging parties." *EEOC v. United Parcel Serv.*, 94 F.3d 314, 318 (7th Cir.1996). There is no principled manner to reconcile this holding with a more stringent standard for cases where the complaining party remains the same but the legal theories applied to the same constellation of facts changes or expands. This standard has been articulated in a variety of ways. For example, in *EEOC v. Harvey L. Walner and Assoc.*, 91 F.3d 963, 968 (7th Cir.1996), the court noted that the EEOC may pursue any unlawful conduct uncovered by its investigation "provided that there is a reasonable nexus between the initial charge and the subsequent allegations." *See also EEOC v. St. Anne's Hosp.*, 664 F.2d 128 (7th Cir.1981) (citing *Jenkin's* standard in dicta). While the court of appeals has not definitively and clearly addressed this precise point of law, the analysis engaged in above comports with that applied by other district courts in the Seventh Circuit. *EEOC v. Tempel Steel Co.*, 723 F.Supp. 1250 (N.D.Ill.1989) (finding "no doubt" that Seventh Circuit would agree with *General Electric* analysis); *EEOC v. Chicago Miniature Lamp Works*, 526 F.Supp. 974, 974–75 (N.D.Ill.1981) (same, focusing on EEOC investigation and letter of determination).

In the case at bar, Johnson's initial charge, as first amended, alleged race-based discrimination with regard to discipline, transfer, and discharge. In June of 1996, the charge was again amended to allege that these same three acts were also based on a retaliatory motive. Finally, the EEOC seeks to also litigate a racially hostile environment theory. The factual bases of the retaliation theory appear at this stage to be the complaints Johnson lodged about the alleged events that provide a basis for the hostile environment theory. The specific allegations are thus related, forming a coherent set of claims. This is amplified by the fact that Johnson informed the EEOC investigator of the factual bases for all of these claims in her initial interview. Finally, given the common thread that runs through these claims, it is patently reasonable that the EEOC subjected all of them to the required investigation and procedure.

Also important is that St. Michael was informed of the EEOC's intention to investigate all of these claims and all of these claims were subject to the conciliation and determination procedures that an administrative charge is designed to trigger. In other words, the failure of Johnson's charge to specifically enumerate the claims in this lawsuit has not cost St. Michael anything to which it was entitled. In light of this, the EEOC must be permitted to carry-out its duty to pursue those alleged violations of law that it uncovered in the investigation triggered by Johnson's complaint. Therefore, the defendant's timeliness argument fails because, unlike the private plaintiff, the timeliness of an EEOC action is subject only to laches, *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), a defense not argued in the instant motion. St. Michael's first motion for summary judgment based on the timeliness of the retaliation and hostile environment claims shall be denied.

### B. *St. Michael's Substantive Challenges*

St. Michael's second motion for summary judgment attacks the merits of the hostile environment claim, all the disparate treatment claims, and the claim alleging retaliatory denial of a transfer to the PAR position.

#### 1. *Hostile Environment*

■ Harassment based on one's membership in a protected class, which creates a hostile or abusive working environment, is actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Such harassment exists under Title VII where the conduct in question " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an

intimidating, hostile, or offensive working environment.'" *Id.* at 65, 106 S.Ct. 2399 (quoting 29 C.F.R. § 1604.11(a)(3)).

The process for determining whether a hostile work environment exists was further developed by the Supreme Court in *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). *Harris* held that for harassment to be actionable under Title VII, it must both create an objectively hostile or abusive environment, viz. from the perspective of a "reasonable person" in plaintiff's position, and subjectively be perceived so by plaintiff herself. *Id.* at 22, 114 S.Ct. 367; *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1454 (7th Cir.1994). The determination of whether there existed a hostile environment is not a "mathematically precise test." *Harris,* 510 U.S. at 22, 114 S.Ct. 367. In making this determination, the totality of the circumstances must be considered. *Id.* at 23, 114 S.Ct. 367.

Two problems immediately emerge with St. Michael's request for summary judgment as to this claim. First, despite the fact that, for the purposes of this motion, St. Michael purports not to dispute many of the facts Johnson alleges, St. Michael indeed appears to object to many of these allegations as "argumentative" or "conclusory." Second, St. Michael attempts to sidestep these factual allegations by repeating the timeliness argument rejected above, asking the court to ignore an alleged history of race-oriented incidents. St. Michael does not quarrel with the fact that Johnson subjectively perceived a hostile environment, fulfilling one of *Harris's* two requirements. The remaining issue, therefore, is whether a "reasonable person" in Johnson's position would have had the same perception.

St. Michael's first argument on this score focuses only on the 300 days preceding the filing of Johnson's initial EEOC charge. This perspective flows from the fact that an EEOC charge must be brought within 300 days [1] of the alleged discrimination. St. Michael posits that only two incidents occurred during this period, falling well short of the showing necessary for maintaining a hostile

environment claim. The first is the alleged conversation between Wendel and Martinez wherein Wendel appeared to be agreeing with Martinez's allegedly racial suggestions about St. Michael's hiring. St. Michael contemplates as the second relevant incident Sally Anello allegedly telling Cheryl Serio to "keep practicing [drawing blood] on blacks."

The EEOC takes issue with this argument in two respects. First, the EEOC asserts that many more relevant incidents took place within the charging period than St. Michael discusses. Second, the EEOC argues that the 300–day deadline does not require a fact finder to ignore relevant incidents that predate that period.

▇ An act of harassment need not be facially and specifically racial in nature when examined in isolation in order to support a claim of a racially hostile environment. This much seems clear from the Supreme Court's instruction to consider the totality of the circumstances at issue. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. Moreover, the objective prong of the hostile environment requires the court to view the allegations from a reasonable person *in the position of the person claiming injury.* Such context can be difficult to discern from paper submissions. *See Courtney v. Biosound,* 42 F.3d 414, 419 (7th Cir.1994) (discussing unique problems posed by summary judgment in discrimination litigation). For example, based on the facts evidenced by the EEOC, the court cannot find as a matter of law that many of the incidents that occurred in the last 300 days of Johnson's employment were not race-based. For example, Wendel's alleged ongoing harassment of Johnson—including regular meetings at which Wendel would verbally abuse Johnson, and in one case threw a book at her—could fit this category. This is especially true in light of Wendel's alleged history of overt racial commentary. Likewise, allegedly racist comments about African–American patients could reenforce a hostile work environment. The nature of a hostile environment claim is unusually context dependent. Based on the submissions, therefore, the

---

1. The 300–day period adheres rather than the 180–day period generally provided by 42 U.S.C. § 2000e–5(e) because Wisconsin is a deferral state under that subsection.

court cannot find that Johnson did not suffer a racially hostile work environment during the 300 days before she filed her charge.

▮ Likewise deficient is St. Michael's repeated insistence that the charging period renders categorically irrelevant any and all alleged acts of discrimination that occurred or began more than 300 days before Johnson filed her charge. This proposition is incorrect, even if those acts are themselves rendered inactionable by a late filing. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1266 (7th Cir.1991) (considering a ten-year history of race-based harassment). More importantly, St. Michael cannot avoid answering for those allegations that predate the charging period in this case because, based on the facts as developed thus far, the EEOC may proceed on a "continuing violation" of a hostile workplace claim based on an environment of racial harassment that emerged well before and continued through the charging period. *Davidson v. Indiana–American Water Works*, 953 F.2d 1058 (7th Cir.1992).

▮ The continuing violation doctrine renders actionable incidents that predate the 300–day charging period, by linking them to incidents in the charging period. To prove a continuing violation, a plaintiff must demonstrate an ongoing pattern of discrimination and that at least one act of discrimination occurred during the charging period. *Id.* at 1060. The acts that predate the charging period must be related closely enough to the acts that postdate the onset of the charging period so as to be considered parts of an ongoing violation. *Koelsch v. Beltone Elect. Corp.*, 46 F.3d 705, 707 (7th Cir.1995).

▮ The facts as submitted for this motion meet this standard. This is not a case in which an employee has strung together a small handful of incidents as the basis for a larger claim. Johnson has provided sufficient evidence to allow a jury to find that, from 1989 until 1992, Johnson was subjected to an ongoing culture of racial hostility in which African–American patients and employees were regarded and treated in a discriminatory fashion. The recounted events are too numerous and diverse, and complicated by the promotion of Wendel, an allegedly

discriminatory actor, and other nuances of the workplace, to simply tally them and render judgment. Such oversimplification would be to flout *Harris's* admonition to avoid applying a mathematical-type test. *See Harris*, 510 U.S. at 22, 114 S.Ct. 367; *see also Daniels*, 937 F.2d at 1273–74 (no "magic threshold" delineates a hostile environment).

The EEOC has a last hurdle it must clear before garnering the benefit of the continuing violation theory. *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164 (7th Cir.1996), establishes that a plaintiff may not sit on her rights and then invoke the continuing violation doctrine as a means of litigating events stretched out over a long period of time:

> The most difficult case arises when a long-continued series of harassing acts definitely *are* a series, a pattern, and not merely a set of discrete events, yet it was evident long before the plaintiff finally sued that she was the victim of actionable harassment. It seems to us that in such a case, while she can still sue provided that the last act of harassment occurred within the statute of limitations, she cannot reach back and base her suit also on conduct that occurred outside the statute of limitations; for she had no excuse for waiting that long.

*Id.* at 1167.

*Galloway's* "most difficult case" is rendered easier in the action at bar because, according to the facts submitted, Johnson had an excuse for waiting—she invoked and relied on St. Michael's management to address allegedly discriminatory acts in the workplace. According to the submissions, Johnson complained long and loud, trying to effect a remedy. In fact, St. Michael's Employee Relations Policy itself specifically discouraged taking such matters to third parties for resolution. The fact that these in-house avenues allegedly failed cannot now be used to shield St. Michael. St. Michael's reliance on *Speer v. Rand McNally & Co.*, 123 F.3d 658 (7th Cir.1997), does not change this result. The plaintiff in *Speer* could not avail herself of the continuing violation doctrine because there was "no anchor allegation of . . . harassment within the applicable period." *Id.* at 664. That is, Speer could not rely on

her use of internal complaint procedures to expand the charging period, because the harassment on which she sued had ceased by the time that period began. In contrast, the EEOC seeks to sue on harassment that allegedly began before the charging period and continued through it. While evidence at trial may change some of the legal conclusions discussed *supra*, based on the submissions at this stage, the court finds that the EEOC may pursue this claim under a continuing violation theory.

Given the foregoing analysis, St. Michael can prevail on its motion if the court finds that all of the harassment Johnson claims to have suffered from 1989–1992 could not fulfill the objective, reasonable person, prong of the *Harris* analysis. In *Daniels*, the Seventh Circuit noted some examples of factors that can be considered:

> the nature of the alleged harassment, the background and experience of the plaintiff, her coworkers, and supervisors, the totality of the physical environment of the plaintiff's work area, the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs, coupled with the reasonable expectation of the plaintiff upon voluntarily entering that environment.

*Daniels*, 937 F.2d at 1274 (*citing* 29 C.F.R. § 1604.11(b)).

As the *Daniel's* court found, these factors illustrate the highly individualized nature of this analysis. This authority underscores the mandate that the court conduct the objective prong of the *Harris* analysis from the perspective of the person claiming injury.

In the case at bar, the facts as developed thus far meet the typical benchmarks in terms of frequency and offensiveness. Two factors ultimately convince the court that this claim should be resolved by a jury. First, Wendel's role as both Johnson's supervisor and as alleged antagonist heightens the possibility of a hostile environment. *See Jansen v. Packaging Corp. of America*, 123 F.3d 490, 502 (7th Cir.1997) (the fact that a supervisor engages in harassment heightens likelihood that harassment affects terms and conditions of employment). Second, the facts show that much of the harassment alleged in this case was intertwined with the work done at St. Michael so that Johnson could do little to escape it; this is not a case resting on offensive, idle chit-chat. Alleged examples include certain work being termed "nigger work," Anello telling Serio to "keep practicing on the blacks," African–American patients being talked about as though it were a foregone conclusion that they would not pay their bills, had too many children, etc., African–American employees being asked to "interpret" what African–American patients said, a discussion that could be understood to implicate race in hiring, as well as a host of other allegedly race and work related comments and acts.

In the end, the text of Title VII provides the best guidance. It forbids discrimination in the "terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). St. Michael's motion with regard to the hostile environment claim asks the court to find as a matter of law that the undisputed facts demonstrate that no harassment took place that could have affected the conditions Johnson worked under while at St. Michael. Based on the foregoing, the court cannot grant this request.

### 2. *Denial of Johnson's Transfer to the PAR Position*

The EEOC alleges that Johnson was passed over for the PAR position both because of her race and in retaliation for her complaints of discrimination. As to this specific issue, the denied transfer, the EEOC proffers only evidence probative of retaliation and not racial discrimination. Therefore, St. Michael's motion for summary judgment will be granted as to race discrimination and denied as to retaliation with regard to St. Michael's refusal to transfer Johnson to the PAR post.

A preliminary issue common to both of these claims is whether denial of the transfer amounts to a "materially adverse employment action" within the meaning of Title VII. It is undisputed that a transfer would not have entailed a change in pay, benefits or hours. A "materially adverse change in the

terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l. Bank and Trust*, 993 F.2d 132, 136 (7th Cir.1993). However, it is well settled that whether an employment action is sufficiently adverse so as to be actionable often turns on the specifics of the workplace in question. The EEOC proffers a well founded argument: While in a position supervised by Wendel, Johnson was subjected to a racially hostile work environment. The transfer to the PAR position would have changed this. By legal definition, a hostile environment is unlawful discrimination in the *terms and conditions of employment;* the refusal to allow an employee to transfer out of such an environment into one without unlawfully tainted working conditions, i.e. materially superior ones, is sufficiently adverse to be actionable under Title VII. *See Smart v. Ball Univ.*, 89 F.3d 437, 440–41 (7th Cir. 1996) (recognizing that "adverse employment action" is defined quite broadly and can be premised on terms and conditions of employment apart from hours, pay, or benefits).

### a. *Retaliation*

Title VII prohibits an employer from retaliating against an employee for engaging in acts protected by that statute. 42 U.S.C. § 2000e–3(a). Like a claim of disparate treatment, retaliation can be analyzed under the ubiquitous burden-shifting model announced in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The prima facie case for unlawful retaliation requires a plaintiff to show that she participated in a protected activity, she subsequently suffered an adverse employment action, and that there was a causal link between the protected activity and the adverse employment action. *Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514 (7th Cir. 1996).

Once a plaintiff makes such a showing, the employer must articulate an alternative, permissible explanation for the challenged employment decision. If the employer makes this showing, the employee is entitled to proffer evidence that the employer's explanation is pretext for retaliation; that is, that

the employer is lying. *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996).

■ Here, Johnson's complaints of discrimination fulfill the first element of the prima facie case. St. Michael asserts that the EEOC cannot complete a prima facie case because denial of Johnson's transfer was not an adverse employment action and because the EEOC cannot prove a causal link between Johnson's complaints of discrimination and the denial. The court having found, *supra*, that denying an employee a transfer from a racially hostile work environment is actionably adverse, now turns to evidence of a causal link between Johnson's complaints and the denial of her transfer.

St. Michael's main argument on this score is that Jurishica had only limited knowledge of Johnson's complaints of discrimination. This argument fails for two reasons. First, whether Jurishica had "enough" knowledge of Johnson's complaints as to form retaliatory intent, is a question a jury, not the court, must answer. The submissions simply provide no basis for the court to determine that Jurishica did not possess information sufficient to make retaliation a motive. At this stage, it is sufficient that Jurishica had some knowledge that Johnson engaged in protected activity. Second, Jurishica was not the only decision-maker involved. It is undisputed that Dr. Smith had a role in the decision-making process and had something of an extensive knowledge of Johnson's complaints.

The evidence demonstrates a sufficient causal link by illustrating the timing and sequence of events: "a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir.1994). Based on submissions before the court, the tension between Wendel and Johnson over incidents perceived by Johnson to be racial was at a fever pitch during the Spring and Summer of 1992—right as Johnson began the process of applying for the transfer. This itself, is enough to demonstrate a prima facie case.

Another point is worth noting: Jurishica's explanation that Johnson was too aggressive

for the PAR position may be probative of causation. One reasonable inference the court draws from the evidence before it is that Wendel, Dr. Smith, and others perceived Johnson's consistent complaints of racial discrimination to be insubordinate and, for lack of a better phase, aggressive. One task a jury may face is deciding whether "aggressive" is a euphemism for "she complains about racial discrimination." The facts underlying this question bolster a prima facie case of retaliation.

In light of the prima facie case, St. Michael proffers what it asserts is a legitimate, nonretaliatory reason for passing over Johnson for the PAR position: Johnson's alleged aggressiveness. Because courts must defer to an employer's judgment on the qualities it seeks in its employees, this assertion rebuts the presumption of retaliation raised by the prima facie case.

■ However, for the reason discussed above, there is an issue for the jury as to whether the evaluation of Johnson as "aggressive" is pretextual. *Monroe v. Children's Home Assoc. of Ill.,* 128 F.3d 591, 593 (7th Cir.1997) (demonstration that one proffered ground for employment action is pretext may call into question other proffered grounds). Further, the EEOC's evidence that St. Michael's proffered explanations for the denied transfer have changed over time bolsters the case that the proffered reasons are pretextual. *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir.1994). Finally, there is a dispute over Johnson's relevant experience regarding the PAR position. Specifically, Johnson's history of occasional PAR work and Jurishica's alleged assurances that, in light of Johnson's previous PAR work, Johnson's training for the full-time position would not take very long, are sufficient to entitle the EEOC to have a jury resolve these questions.

Summary judgment is inappropriate on the claim that St. Michael denied Johnson the PAR position in retaliation for Johnson's complaints of racism because the disputes before the court could be resolved in favor of the EEOC. St. Michael's motion on this claim will be denied.

### b. Racial Discrimination

■ The EEOC also claims that passing over Johnson for the PAR position was an act of racial discrimination, i.e. on account of Johnson's race. This claim is grounded primarily in Jurishica's belief that Johnson was too aggressive. The EEOC claims that this reliance on aggressiveness amounts to impermissible stereotyping. While it is possible that such is true, the EEOC proffers no evidence that Jurishica was engaging in racial stereotyping in this respect. *Cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 250–52, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (denial of partnership to a woman because she was, in contrast to the stereotypical female, too aggressive). As discussed above, "aggressiveness" may be a proxy for retaliation in this case, because there is evidence beyond the use of the term "aggressiveness" that Johnson's complaints of discrimination were seen by management as inappropriate employee behavior. No such evidence would allow a jury to infer race discrimination from the term "aggressiveness." St. Michael's motion for summary judgment on the claim that Johnson was denied the PAR position on account of her race will be granted.

### 3. Discipline and Discharge Based on Race

St. Michael has also moved for summary judgment on the claims that it disciplined and discharged Johnson due to her race. Two methods of proof have emerged for these types of claims. The first is where the plaintiff offers direct evidence that a given employment decision was made with a discriminatory motive. Second, because most discriminatory employers will not create an explicit trail of evidence, *see Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1420 (7th Cir.1992), discrimination can be proven through a circumstantial model which shifts the burden of proof to the defendant once a plaintiff has proffered a prima facie case sufficient to raise an inference of discrimination. *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817.

Once the plaintiff proffers a prima facie case, a rebuttable presumption of discrimination arises, requiring the defendant to come

forward with a legitimate non-discriminatory reason for its actions. Once such a reason is offered, the presumption of discrimination dissolves. *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397 (7th Cir.1996). At that point, the burden shifts back to the plaintiff to proffer evidence from which a rational fact finder could infer St. Michael's explanations are merely a pretext for a discriminatory act. *See Senner v. Northcentral Technical College*, 113 F.3d 750, 755 (7th Cir.1997). That is, the EEOC must show that St. Michael's decision-makers are lying in order to mask discriminatory motive. *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir.1995).

While the discipline and the discharge claims are distinct, the parties brief them together. This makes sense because the analysis is the same and because the two claims are different aspects of the same set of facts insofar as Johnson's discharge was the end result of the challenged discipline.

### a. *Direct Evidence*

■ The EEOC asserts that Wendel's alleged history of racial "humor" and commentary provide direct evidence that Wendel's motives in disciplining and discharging Johnson were racially discriminatory. The court finds, however, that these incidents do not suffice to free the EEOC of the burden-shifting model. While any alleged evidence of racism on Wendel's part is relevant, especially because of Wendel's status as decision-maker, such evidence does not meet the plaintiff's burden on its own.

■ "Direct evidence" is evidence that, if taken as true, permits a reasonable finder of fact to find a second assertion to be true "without reliance upon inference or presumption." *Plair v. E.J. Brach and Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997). The Seventh Circuit further narrows the definition: direct evidence for the purposes of surviving summary judgment in a Title VII case "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle v. LaSalle Telecomm., Inc.*, 876 F.2d 563, 569 (7th Cir.1989).

■ Thus, direct evidence that demonstrates that a decision-maker holds discriminatory attitudes is insufficient. Further, direct evidence that the decision-maker makes some employment decisions on the basis of a discriminatory bias is insufficient. The direct evidence must demonstrate that the decision-maker discriminated in the precise decision under attack. *Id.*

One example is Wendel's alleged conversation with Martinez, overheard by Serio, in which Martinez made what could be understood as racist suggestions about hiring. Assuming that Wendel's alleged nodding silence could be construed as adoption of Martinez's statements, and the court is making a leap for the sake of example, this alone could not defeat summary judgment as direct evidence because the conversation did not deal specifically with the decisions regarding Johnson that the EEOC challenges. While evidence of discriminatory attitudes on Wendel's part do not rise to the level of "direct evidence," such evidence is not, of course, irrelevant and bolsters an inference of discrimination under the burden-shifting model.

### b. *The Burden–Shifting Model*

#### (1) *The Prima Facie Case*

*McDonnell Douglas* requires that the EEOC establish a prima facie case that Johnson's discipline and discharge were imposed for discriminatory reasons. To meet this burden, the EEOC must show (1) that the plaintiff belongs to a protected class, (2) that the plaintiff was performing to the employer's legitimate expectations for the position, (3) that the plaintiff suffered an adverse employment action, and (4) that similarly situated white employees received more favorable treatment. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The last element merely requires some indicium of discrimination. The version laid out in this decision is merely the most typical means of raising such a presumption. *See Leffel v. Valley Fin. Servs.*, 113 F.3d 787 (7th Cir.1997) (*explaining O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)).

St. Michael challenges the EEOC's ability to meet elements (2) and (4). Taking num-

ber (4) first, the court finds it unnecessary to analyze whether the EEOC has submitted proper evidence that white employees were treated better than Johnson because there is sufficient other evidence to complete the inference of discrimination in the challenged employment actions. *See, e.g.,* the court's discussion of direct evidence, *supra.* This is the showing required by the fourth element.

St. Michael further challenges the second element, whether Johnson was meeting St. Michael's legitimate expectations of its employees. The evidence on this point, however, is in dispute and must be left for a jury to wrestle with. Specifically, St. Michael asserts that Johnson did not meet St. Michael's expectation that its employees would not be insubordinate but would respect supervisors' authority. This assertion does not end the case for two reasons:

■ First, while Johnson's evaluations are not uniformly positive, they are largely so. Approximately six months before Wendel fired Johnson, Johnson's evaluation stated that Johnson was a "good employee." This is sufficient to complete the prima facie case. *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous"). As will be discussed below, it is also not clear that St. Michael's expectation that an employee will not be insubordinate is a *legitimate* one in the context of this case. Setting that expectation to one side for a moment, it appears from the record that Johnson was meeting St. Michael's other expectations. In the end, this determination rests on disputes of fact and inference, and on complex issues of credibility such that ending the case here would be premature.

### (2) Pretext

■ Since the EEOC has made a prima facie showing of discrimination, the burden shifts to St. Michael to proffer a non-discriminatory explanation for disciplining and discharging Johnson. Towards this end, St. Michael raises Johnson's alleged insubordination anew. In order to save these claims from summary judgment, the EEOC must now offer evidence that Johnson's alleged insubordination is not the reason Johnson was disciplined and fired. The court finds that the EEOC proffers sufficient evidence on this score to entitle the parties to a jury trial on these issues.

■ First, the EEOC has submitted evidence that some of the instances of alleged insubordination never took place. This is a textbook means of showing pretext. *See, e.g., Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir.1996). Second, resolving all disputes in favor of trial, what St. Michael labels insubordination could be a misnomer for tension that arose between Wendel and Johnson based on Wendel's alleged discriminatory attitudes, acts, and comments. While the courts give employers a very wide berth in establishing the standards for their employees, an employer is not entitled to require, as a condition of employment, that an employee respond to a supervisor's racial animus with good cheer. Though employers' use of subjective criteria in employment decision-making is not per se illegal, such criteria has been recognized as potential camouflage for discrimination, requiring greater scrutiny than explanations based on standardized evaluation. *Perfetti v. First Nat'l Bank of Chicago,* 950 F.2d 449, 457 (7th Cir.1991) (*citing Namenwirth v. Board of Regents of Univ. of Wis. Sys.,* 769 F.2d 1235, 1243 (7th Cir.1985)).

In this case, again resolving disputes in favor of trial, it may be that Johnson's "insubordination" is merely the flip-side of Wendel's alleged campaign of harassment that eventually led to Johnson's discharge. At least two threads of evidence support this proposition. First is significant evidence of Wendel's expressions of racial animus in the workplace. Given that it was Wendel to whom St. Michael entrusted the power to apply the subjective employment criteria, evidence that Wendel possessed and acted on discriminatory attitudes could prove that Johnson's alleged insubordination was a pretext for discrimination. This is amplified by evidence that the alleged incidents of insubordination, upon which Wendel and St. Michael relied, never happened or that Wendel refused to investigate them.

Based on the papers filed in support of and in opposition to St. Michael's motion, the court cannot resolve these issues. Therefore, St. Michael's motion for summary judgment will be denied as to the disparate treatment claims related to Johnson's discipline and discharge.

## CONCLUSION

The foregoing represents an application of those analyses that currently control the legal controversies before the court. The nature of the allegations involved in this case require an unusual amount of credibility-related fact-finding and mental-state evaluation. While retaliatory motive and race discrimination are both unlawful, they are not legally the same thing. However, in a sea of facts, they may be difficult to distinguish from each other and from permissible motivations for employment decisions. These determinations are complicated here because the EEOC's allegations, unlike other multi-theory discrimination cases, do not merely allege a handful of discrete incidents, but paint a picture of a work-culture that is difficult, if not impossible, to fruitfully debate on paper.

The defendant St. Michael Hospital of Franciscan Sisters, Milwaukee, Inc.'s June 12, 1997 motion for partial summary judgment based on the untimeliness of claims is **DENIED.**

The defendant St. Michael Hospital of Franciscan Sisters, Milwaukee, Inc.'s August 29, 1997 motion for summary judgment on the merits of the claims in this case is **GRANTED** with regard to the claim that Connie Johnson was denied a transfer based on race. In all other respects, the motion is **DENIED.**

What remains for trial are the claims that Johnson was subjected to a racially hostile work environment, was denied a transfer, was disciplined, and was discharged in retaliation for protected activity, and that Johnson was disciplined and discharged because of her race.

The courtroom deputy clerk will notice a telephonic conference to schedule pretrial and trial dates.